Filing # 248012960 E-Filed 05/12/2026 03:23:07 PM

IN THE COUNTY COURT OF THE 9th JUDICIAL CIRCUIT IN AND FOR ORANGE COUNTY, FLORIDA

K & A ROSARIO HOLDINGS LLC and MJR FUND I, INC.,

Plaintiffs,

v.

FIRST HORIZON BANK,

Defendant.

CASE NO.

**COMPLAINT**

Plaintiffs, K & A Rosario Holdings LLC and MJR Fund, Inc., by and through undersigned counsel, hereby sue Defendant, First Horizon Bank, and state as follows:

**THE PARTIES**

1. Plaintiff, K & A Rosario Holdings LLC ("K&A"), is a Florida limited liability company with its principal place of business in Orange County, Florida.

2. Plaintiff, MJR Fund, Inc. formerly known as Century Metals & Supplies, Inc. ("MJR"), is a Florida corporation with its principal place of business in Orange County, Florida.

3. Defendant, First Horizon Bank ("First Horizon"), is a Tennessee for-profit corporation authorized to conduct business in Florida with branch locations in Orange County.

**JURISDICTION AND VENUE**

4. Jurisdiction is proper because this is an action seeking damages in excess of $50,000.00, exclusive of prejudgment interest, attorneys' fees, and costs.

5. Personal jurisdiction is proper because First Horizon operates its business in Orange County, Florida, because the causes of action arose in Orange County, Florida, and because under the First Horizon Terms and Conditions, "the venue for resolving the dispute [between the parties]

shall be in a court of competent jurisdiction in the state where the branch at which [Plaintiffs] have [their] account is located."

6. All conditions precedent to the filing of this action have been waived or satisfied.

## BACKGROUND ALLEGATIONS

### *A. K&A's and MJR's business accounts with First Horizon*

7. At all relevant times, K&A and MJR have had business accounts with First Horizon.

8. The signatories of K&A's and MJR's business accounts were Misael Rosario (the Manager of K&A, President of MJR, and beneficial owner) and Jean Rosario (the Authorized Member of K&A and the Vice President of MJR).

9. Misael Rosario was also the signatory for First Horizon business accounts owned by two other Florida limited liability companies—i.e., Palm Lakes Investments LLC ("Palm Lakes") and CEME Holdings LLC ("CEME").

10. First Horizon assigned Marjorie Alonso (the First Horizon Client Specialist Team Lead) to K&A's and MJR's accounts.

### *B. Lack of activity of K&A's and MJR's business accounts*

11. During the six-month period of September 2025 to March 2, 2026, the First Horizon business account of K&A did not reflect ***any*** withdrawals. In fact, the only activity on this account during those six months was (a) three deposits in September 2025; and (b) monthly interest.

12. The First Horizon business account of MJR reflected more activity than K&A's business account. However, most of the withdrawals in MJR's business account were between $101.00 and $5,148.00. And in the four months leading to March 2026, the largest withdrawal from MJR's business account was $44,801.36.

13. Similarly, in the six months before March 2026, the First Horizon business account of Palm Lakes did not reflect any wire transfers out to any third parties.

14. Additionally, in the five months before March 2026, the First Horizon business account of CEME reflected only one wire transfer out of the account to a third party for only $101.78.

15. In other words, all four First Horizon business accounts for which Misael Rosario was a signatory reflected close no wire transfers out (or very little / limited wire transfers out) during the several months leading to March 2026.

***C. Fraudulent wire transfer requests and First Horizon's complete failure to employ security procedures***

16. On March 3, 2026, an unknown and unauthorized person gained access to Plaintiffs' online First Horizon account.

17. Importantly, the unknown and unauthorized person accessed Plaintiffs' online First Horizon account using an IP address located in Buffalo, New York. The prior logins to Plaintiffs' First Horizon online account used IP addresses located only in Florida.

18. That same day (i.e., March 3, 2026) at around 12:07 p.m., the unknown and unauthorized person called First Horizon's Treasury Management Technical Support from the telephone number 213-205-0998.

19. This telephone number does not belong to Plaintiffs or any of Plaintiffs' agents. Plaintiffs also did not register, record, or associate this phone number with First Horizon.

20. Additionally, this phone number reflects an area code in California. Plaintiffs and their authorized members/officers reside in Florida and registered only Florida telephone numbers with First Horizon.

21. The unknown and unauthorized person claimed to be Misael Rosario but spoke with a pronounced accent that did not sound like Misael Rosario and pronounced (and mispronounced) the name of Misael Rosario in distinctly different ways during his brief conversation with First Horizon—i.e., in one occasion, he claimed his name was "Misahal," and in another occasion, he claimed his name was "Misael."

22. The unknown and unauthorized person also named MJR as the account he was attempting to access, but he did not identify K&A.

23. The unknown and unauthorized person claimed he needed to update his token because he "got a new iPhone 14."

24. As part of the "verification process," the First Horizon agents asked the unknown and unauthorized person to spell the last name of Misael Rosario, to provide an email address, and last four digits of a phone number—all of which are pieces of information that are publicly available on Florida's Secretary of State website, online business directories such as Cybo.com, and Google searches.

25. The First Horizon agent then stated that sent a one-time passcode to the phone number and asked the unknown and unauthorized person to read out the one-time passcode.

26. The unknown and unauthorized person then stated that he could not receive the one-time passcode because "It does not come in as a text. It's a land line." He asked the First Horizon agent to sent a voice call one-time passcode.

27. Within minutes after the unknown and unauthorized person ended his phone call with First Horizon, he attempted to login to Plaintiffs' online account with First Horizon.

28. At around 12:52 p.m., First Horizon's system detected three "possible" Cross-Site Request Forgery ("CSRF") attacks—all of which originated from an IP address in Buffalo, New York.

29. Over the next 30 minutes (i.e., until about 1:24 p.m. on March 3, 2026), First Horizon received six separate wire transfer requests out of the K&A business account reflecting a total of $4,850,700.00.

30. And over the following few hours, First Horizon received two additional wire transfer requests reflecting another $1,550,000.00 from the K&A business account.

31. As explained above, K&A's business account did not reflect ***any*** withdrawals during the six-month period of September 2025 to March 2, 2026,

32. First Horizon failed to exercise ordinary care after receiving the multiple back-to-back wire transfer requests.

33. First Horizon did not use commercially reasonable security procedures in connection with the fraudulent wire transfers.

34. As explained above, First Horizon did not properly verify the fraudulent wire transfer requests.

35. On March 3, 2026, First Horizon accepted and completed three of the fraudulently requested wire transfers out from K&A business account—i.e., one for $1,000,000.00, another for $950,000.00, and another for $750,000.00.

36. On March 4, 2026, First Horizon accepted and completed another four wire transfers out from K&A business account—i.e., $950.000.00; $850,000.00; $700,000.00; and $200,000.00.

37. Finally, on March 5, 2026, First Horizon accepted and completed another two wire transfers, one out of K&A's business account and the other from MJR's business account.

38. Below is a summary of the wire transfers that First Horizon accepted and completed on March 3, 4, and 5, 2026 (collectively, the "Fraudulent Transfers"):

| Date | Account Holder | Amount | Beneficiary |
|---|---|---|---|
| March 3, 2026 | K&A | $ (1,000,000.00) | Stone Creek Vineyards Inc. |
| March 3, 2026 | K&A | $ (950,000.00) | Steelcrest LLC |
| March 3, 2026 | K&A | $ (750,000.00) | Eloisa Consulting LLC |
| March 3, 2026 | K&A | $ (950,000.00) | Shaoxing Fanshun Import and Expert |
| March 3, 2026 | K&A | $ (850,000.00) | Weifang MNMJ Trading Co Ltd. |
| March 3, 2026 | K&A | $ (700,000.00) | Shaoxing Fanshun Import and Expert |
| March 3, 2026 | K&A | $ (200,000.00) | Eloisa Consulting LLC |
| March 4, 2026 | K&A | $ (200,000.00) | Eloisa Consulting LLC |
| March 5, 2026 | MJR | $ (435,000.00) | Eloisa Consulting LLC |
| March 5, 2026 | K&A | $ (400,000.00) | Shaoxing Fanshun Import and Expert |
| March 5, 2026 | K&A | $ (240,000.00) | Shaoxing Fanshun Import and Expert |
| March 5, 2026 | K&A | $ (42,700.00) | Jen-Miller Art Galleries |
| **Total** | | **$ (6,517,700.00)** | |

39. Neither K&A nor MJR have previously sent any funds to (or conducted any business with) any of the beneficiaries to whom First Horizon wire transfers were sent.

40. First Horizon was in the best position to prevent the significant fraud perpetrated against K&A and MJR.

41. Under its agreement with Plaintiffs (and under common law), First Horizon was required to establish certain security procedures for verification of wire transfer requests—including, but not limited to, procedures to verify that the communications and requests received by First Horizon are, in fact, those of K&A and MJR.

42. Moreover, First Horizon agreed to (and was otherwise obligated to) establish security procedures to authenticate K&A's and MJR's identity and verify the instructions provided to First Horizon.

43. First Horizon also agreed to be responsible for changing or updating the security credentials from time to time.

44. First Horizon failed to employ its own security procedures and otherwise failed to employ commercially reasonable security procedures.

***D. First Horizon's failure to timely notify Plaintiffs of the fraudulent wire transfer requests and unlawful attempts to exonerate itself***

45. Plaintiffs did not receive any notification from First Horizon about the Fraudulent Transfers until March 5, 2026 at 1:13 a.m.

46. Specifically, at 1:13 a.m. Eastern Time on March 5, 2026, First Horizon finally sent Plaintiffs an email stating "there are payments and/or transfers awaiting approval. Please login prior to the payment and/or transfer cutoff time to approve or reject the transaction."

47. Egregiously, First Horizon wrote into the body of the email that it was sending the email on "Mar 4, 2026" (without reflecting any timestamp) where, in reality, First Horizon sent the email on March 5, 2026 at 1:13 a.m.

48. As soon as Plaintiffs noticed the email (i.e., around 7:00 a.m. on March 5, 2026), Plaintiffs contacted the Treasury Management department of First Horizon to report the unauthorized wire transfers.

49. First Horizon instructed Plaintiffs to contact their local branch and their Client Specialist Team Lead.

50. At 7:34 a.m. on March 5, 2026, Plaintiffs (through Misael Rosario) emailed Plaintiffs' First Horizon Client Specialist Team Lead, Marjorie Alonso, stating that "[t]here seems to be a problem with our account(s). We contacted Treasury and were told to contact the branch. Let me know what to do."

51. First Horizon then froze all four business accounts connected with Misael Rosario as well as the two personal accounts of Misael Rosario—i.e., the affected accounts of K&A and MJR as well as the unaffected accounts of Palm Lakes, CEME, and Misael Rosario.

52. Shortly thereafter, Plaintiffs demanded First Horizon to reimburse the Fraudulent Transfers.

53. First Horizon did not agree to reimburse the amounts Fraudulent Transfers.

54. On March 12, 2026, Plaintiffs delivered a letter to First Horizon demanding reimbursement of the Fraudulent Transfers.

55. On March 23, 2026, Plaintiffs (through undersigned counsel) also requested First Horizon to release and allow access to the unaffected accounts of Misael Rosario, CEME, and Palm Lakes.

56. In response to Plaintiffs' request to access the unaffected accounts, First Horizon improperly attempted to exonerate itself of liability.

57. Specifically, knowing full well that the undersigned law firm represented Plaintiffs and the related First Horizon account holders, First Horizon sent Misael Rosario a file titled "Digital Banking Takeover Reactivation Letter (System Compromise).docx" without copying the undersigned law firm.

58. First Horizon represented to Misael Rosario that he needed to sign the "Digital Banking Takeover Reactivation Letter" before Misael Rosario (or Plaintiffs) could access the frozen unaffected accounts with First Horizon.

59. When opened, the file titled "Digital Banking Takeover Reactivation Letter" reflected a heading of "Authorization and Release for Account Reactivation." This "Letter"—

which First Horizon demanded Misael Rosario to sign as a condition to allowing Misael Rosario and Plaintiffs to access their accounts—included the following wording:

> Client, for itself and its subsidiaries and affiliates, does hereby, release, acquit and forever discharge First Horizon from and against any and all known or unknown claims, damages, causes of action, lawsuits, obligations and/or liabilities or responsibilities of any kind arising out of or in any way related to Client's security incident [and] the suspension of Client's access to the Digital Banking Service …

60. To be clear, First Horizon held Plaintiffs' (as well as CEME's, Palm Lakes's, and Misael Rosario's) funds hostage in exchange for their agreement to "release … First Horizon from … any and all known or unknown claims"—all without copying Plaintiffs' counsel.

61. First Horizon's attempt to take advantage of Plaintiffs' and Misael Rosario's time-sensitive need to access their funds to strong-arm a "release" is highly improper, especially when First Horizon knew Plaintiffs and Misael Rosario were represented by counsel and yet failed to copy said counsel.

62. First Horizon has recalled and/or reimbursed only $1,952,442.19.

63. To date, First Horizon has refused to reimburse the remainder of the Fraudulent Transfers totaling $4,585,257.81.

**COUNT I**
**(REIMBURSEMENT PURSUANT TO FLA. STAT. § 670.20)**

64. Plaintiffs re-allege and incorporate the allegations set forth in paragraphs 1 through 63 herein as if fully set forth herein.

65. The funds transferred by virtue of the fraudulent wires are governed by Article 4A of the Uniform Commercial Code, codified at Fla. Stat. §670.101, *et. Seq.* ("Article 4A").

66. First Horizon failed to have commercially reasonable security procedures and measures in place in accordance with Section §670.202 of the Florida Statutes.

67. First Horizon's conduct, violates Article 4A as more fully set forth above.

68. By authorizing the fraudulent transfers, First Horizon facilitated and permitted funds to be transferred out of Plaintiffs' accounts, in violation of Fla. Stats. § 670.202 and § 670.204.

69. First Horizon did not have commercially reasonable security procedures in place to verify the transfers.

70. First Horizon had no basis to deem the Fraudulent Transfers to be authorized by Plaintiffs, in violation of Fla. Stat. § 670.202.

71. First Horizon failed to adequately comply with its own security measures and procedures to verify the Fraudulent Transfer.

72. Section 670.204 provides for a refund by a bank to its customer for unauthorized wire transfers.

73. First Horizon's authorization of the Fraudulent Transfers were in contravention of Florida Statute § 670.202, and Plaintiffs are entitled to a refund of all funds unlawfully wired by First Horizon.

74. Plaintiffs did not authorize the Fraudulent Transfers and do not and did not have any relationship with any of the beneficiaries.

75. Separately, First Horizon had a duty to contact Plaintiffs to determine whether the Fraudulent Transfers were in fact authorized, especially because the circumstances were such that a reasonable and prudent bank and its officers and employees would have suspected wrongdoing in this case.

76. Despite the Fraudulent Transfers being clearly suspicious and inconsistent with Plaintiffs' historical banking activity, First Horizon failed to safeguard the accounts.

77. As explained above, First Horizon first attempted to contact Plaintiffs to confirm the Fraudulent Transfers in the middle of the night and ***after*** First Horizon had already accepted and processed the Fraudulent Transfers.

78. First Horizon failed to exercise reasonable and ordinary care in initiating, sending and completing the transfer of funds from Plaintiffs' accounts to unauthorized recipient accounts.

79. As a result, Plaintiffs suffered and incurred damages as a direct and proximate result of the unauthorized and ineffective funds transfers.

For the reasons set forth above, Plaintiffs, K & A Rosario Holdings LLC and MJR Fund, Inc. f/k/a Century Metals & Supplies, Inc., demand entry of judgment in their favor and against Defendant, First Horizon Bank, for damages, prejudgment interest, reasonable attorneys' fees, and for such other relief as the Court deems appropriate.

## COUNT II
## BREACH OF CONTRACT

80. Plaintiffs re-allege and incorporate the allegations set forth in paragraphs 1 through 63 herein as if fully set forth herein.

81. At all relevant times, First Horizon and Plaintiffs were parties to binding contracts, copies of which are attached hereto as Exhibit "1."

82. First Horizon breached the contractual agreements by failing to adequately supervise and/or investigate the unusual and fraudulent account activity in Plaintiffs' accounts.

83. First Horizon breached the contractual agreements by executing, authorizing, or otherwise failing to prevent the Fraudulent Transfers from Plaintiffs' accounts based upon fraudulent and clearly suspicious information as explained above.

84. First Horizon breached the contractual agreements by accepting and acting upon instructions on Plaintiffs' accounts by a person who was not an authorized signatory of the accounts.

85. First Horizon breached the contractual agreements by allowing its employee(s) to fraudulently change the account security information on Plaintiffs' accounts and not following its own internal procedures that were intended to safeguard Plaintiffs funds.

86. First Horizon breached the contractual agreements by not following customary and reasonable banking security procedures and allowing the Fraudulent Transfers to be fraudulently transferred out of Plaintiffs' accounts.

87. First Horizon breached the contractual agreements by failing to reimburse Plaintiffs for said Fraudulent Transfers.

88. As a direct and proximate result of First Horizon's breaches of the contractual agreements, Plaintiffs have suffered damages.

For the reasons set forth above, Plaintiffs, K & A Rosario Holdings LLC and MJR Fund, Inc. f/k/a Century Metals & Supplies, Inc., demand entry of judgment in their favor and against Defendant, First Horizon Bank, for damages, prejudgment interest, reasonable attorneys' fees, and for such other relief as the Court deems appropriate.

Respectfully submitted,

/s/ Victor M. Velarde
Victor M. Velarde
Fla. Bar No. 105620
Email: vvelarde@fowler-white.com
Chloe M. Horton
Fla. Bar No. 1039500
Email: chorton@fowler-white.com

FOWLER WHITE BURNETT, P.A.
Citigroup Center
201 South Biscayne Boulevard, 20th Floor
Miami, Florida 33131
Telephone: (305) 789-9200
Facsimile: (305) 789-9201

# EXHIBIT "1"

# TABLE OF CONTENTS


| | Page |
|---|---|
| **USA PATRIOT ACT NOTICE** | 1 |
| **TERMS AND CONDITIONS** | 1 |
| Agreement | 1 |
| Liability | 1 |
| Deposits | 2 |
| Night Deposit | 2 |
| Withdrawals | 2 |
| Dormant Account | 3 |
| Ownership of Account and Beneficiary Designation | 3 |
| Accounts Established on Behalf of Others | 3 |
| Fiduciary Accounts | 3 |
| Stop Payments | 3 |
| Telephone Transfers | 3 |
| Future Changes | 3 |
| Termination | 4 |
| Duty of Examination, Unauthorized Transactions | 4 |
| Interest | 4 |
| Account Transfer | 4 |
| Reclamation | 4 |
| Setoff | 4 |
| Authorized Signer | 4 |
| Restrictive Legends | 4 |
| Payment Order of Items | 4 |
| ACH and Wire Transfers | 5 |
| Facsimile Signatures | 5 |
| Pledges | 5 |
| Power of Attorney | 5 |
| Stale-Dated Checks | 5 |
| FDIC Insurance | 5 |
| Endorsements | 5 |
| Death or Incompetence | 5 |
| Backup Withholding/TIN Certification | 5 |
| Lost, Destroyed, or Stolen Certified, Cashier's, or Teller's Checks | 5 |
| Changing Account Products | 5 |
| Legal Actions Affecting Your Account | 6 |
| Check Processing | 6 |
| Security | 6 |
| Deposit of Preauthorized Drafts | 6 |
| Claim of Loss for Debited Items | 6 |
| Claim of Loss For Deposit Items | 6 |
| Time Deposits | 6 |
| Address or Name Changes | 6 |
| Arbitration (For Consumer (Personal) Accounts) | 6 |
| Funds Transfers | 8 |
| **ELECTRONIC FUND TRANSFERS** | 8 |
| **AVAILABILITY OF FUNDS POLICY** | 9 |
| **SUBSTITUTE CHECKS AND YOUR RIGHTS** | 10 |
| **CONSUMER ACCOUNT DISCLOSURES** | 10 |


# USA PATRIOT ACT NOTICE

**IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT** - To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

# TERMS AND CONDITIONS OF YOUR ACCOUNT

**AGREEMENT** - This document, along with any other documents we give you pertaining to your account(s), is a contract that establishes rules which control your account(s) with us. Please read this carefully and retain it for future reference. If you sign the signature card or open or continue to have your account with us, you agree to these rules. You will receive a separate schedule of rates, qualifying balances, and fees if they are not included in this document. Should the information contained in this document differ from that contained in the separately provided materials, the separately provided information will control. If you have any questions, please call us.

**FOR CONSUMER (PERSONAL) ACCOUNTS, THIS AGREEMENT REQUIRES YOU AND US TO RESOLVE DISPUTES IN ARBITRATION ON AN INDIVIDUAL BASIS INSTEAD OF IN JURY TRIALS OR CLASS ACTIONS. FOR MORE INFORMATION, PLEASE READ THE SECTION TITLED "ARBITRATION" THAT BEGINS ON PAGE 6.**

This agreement applies both to business and consumer (personal) accounts, except where business accounts are expressly excluded, and is subject to applicable federal laws and the laws of the state where the branch at which you have your account is located (except to the extent that this agreement can and does vary such rules or laws). If you opened your account online, it is subject to Tennessee law. The body of state and federal law that governs our relationship with you, however, is too large and complex to be reproduced here. The purpose of this document is to:

(1) summarize some laws that apply to common transactions;
(2) establish rules to cover transactions or events which the law does not regulate;
(3) establish rules for certain transactions or events which the law regulates but permits variation by agreement; and
(4) give you disclosures of some of our policies to which you may be entitled or in which you may be interested.

If any provision of this document is found to be unenforceable according to its terms, all remaining provisions will continue in full force and effect. We may permit some variations from our standard agreement, but any customer-initiated changes to the agreement, including changes to language on standardized Bank authorization documents, will not be effective unless approved in writing by a Bank President, Executive Vice President or Senior Vice President. The agreement may not otherwise be modified.

"Party" means a person who, by the terms of an account, has a present right, subject to request, to payment from the account other than as a beneficiary or convenience signer (agent).

As used in this document the words "we," "our," "us," and "Bank" mean First Horizon Bank and its division VirtualBank, and the words "you" and "your" mean the account holder(s) and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account. However, this agreement does not intend, and the terms "you" and "your" should not be interpreted, to expand an individual's responsibility for an organization's liability. If this account is owned by a corporation, partnership or other organization, individual liability is determined by the laws generally applicable to that type of organization. The headings in this document are for convenience or reference only and will not govern the interpretation of the provisions. Unless it would be inconsistent to do so, words and phrases used in this document should be construed so the singular includes the plural and the plural includes the singular.

The relationship between you and the Bank is that of independent contractors. We act as a fiduciary only when we are the legal accountholder, such as when we are named a trustee or escrow agent.

**LIABILITY** - You agree, for yourself (and the person or entity you represent if you sign as a representative of another) to the terms of this account and the schedule of charges. You authorize us to deduct these charges, without notice to you, directly from the account balance as accrued. You will pay any additional reasonable charges for services you request which are not covered by this agreement. You agree not to use your account(s) for any illegal purpose, including but not limited to the authorization of any unlawful internet gambling transactions.

Each of you also agrees to be jointly and severally (individually or in solido) liable for any account shortage resulting from charges or overdrafts, whether caused by you or another with access to this account. This liability is due immediately, and can be deducted directly from the account balance whenever sufficient funds are available. You have no right to defer payment of this liability, and you are liable regardless of whether you signed the item or benefited from the charge or overdraft. Each of you appoints each other person signing the signature card as attorney-in-fact for all matters involving the account, rendering each of you personally liable for the other's account activity, including but not limited to, receiving and giving notice, releasing

© 2000 Wolters Kluwer Financial Services, Inc.
All rights reserved.

account information, linking other accounts of a signer (even if only owned by the other signer), pledging or entering separate agreements affecting the account, stop payment orders, deposits, appointing or removing additional signers, and withdrawing funds from, charging or terminating the account.

Each of you consent to Bank, its service providers, and its affiliates, contacting you for any purpose - including for advertising, telemarketing, and fraud prevention purposes - at any telephone number you provide to us. Your consent applies regardless of whether the telephone number is assigned to a residential line, paging service, cellular telephone service, specialized mobile radio service, radio common carrier service, or any other service. Your consent allows us to contact you using telephone calls, text messages, automatic telephone dialing systems, and artificial or prerecorded voices. You agree that we may contact you on any day at any time and that our calls and messages will not be limited to any specific number within any period of time. You understand that calls and messages may result in charges to you and may count against plan limits on minutes or texts. You understand that you are not required to grant consent to receive telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice as a condition of purchasing any property, goods, or services. Your authorization and information may be relied on and used for debt collection purposes.

You will be liable for our costs as well as for our reasonable attorneys' fees, to the extent permitted by law, whether incurred as a result of collection or in any other dispute involving your account. This includes, but is not limited to, disputes between you and another joint owner; you and an authorized signer or similar party; or a third party claiming an interest in your account. This also includes any action that you or a third party takes regarding the account that causes us, in good faith, to seek the advice of an attorney, whether or not we become involved in the dispute. All costs and attorneys' fees can be deducted from your account when they are incurred, without notice to you.

Our liability for losses you incur in connection with your account is limited to actual damages proved that are proximately caused by our failure to exercise ordinary care. Notwithstanding, if we make an error in your favor by excessively crediting or insufficiently debiting your account for any reason, including but not limited to the giving of cash or credit in excess of a corresponding account debit, you agree that you immediately owe us the amount in error, whether you relied on the error or not.

For business account owners, you agree to waive your rights to a jury and to punitive and exemplary damages with respect to the trial of a civil action or cross-action filed against us concerning this account. For consumer account owners, you agree to waive your rights to a jury and to punitive and exemplary damages and further agree to be subject to all parts of the arbitration provision beginning on page 6 of this agreement. Damages for any breach of this agreement are limited to those which are direct and lie in contract, and shall exclude indirect and consequential damages. Also excluded are damages in tort, including but not limited to those for emotional distress, unless caused by a willful and malicious act, which in the case of the unauthorized disclosure of private or confidential information must also be defamatory. In return, we also waive our same rights in any such action, cross-action or claims in arbitration we may file against you. Further any such court action must be brought in a judicial circuit or district in which we maintain a full service branch office, within one year of the date the cause of action arose, or by such earlier time prescribed elsewhere in this agreement. Claims in arbitration, which shall be heard at a location within the federal judicial district that includes your billing address or at a mutually agreed upon location, shall also be submitted within one year of the date of the cause of action arose, or by such earlier time prescribed elsewhere in this agreement.

**DEPOSITS** - We will give only provisional credit until collection is final for any items, other than cash, we accept for deposit (including items drawn "on us"). Before settlement of any item becomes final, we act only as your agent, regardless of the form of endorsement or lack of endorsement on the item and even though we may provide you provisional credit for the item. You agree to examine withdrawal and deposit slips upon receipt and bring errors to our attention immediately, or if received at a remote ATM, as soon as possible. You agree that later claims of cash shortages are barred. We are not liable for the negligence of our correspondents or the loss in transit of items deposited with us. We may reverse any provisional credit for items that are lost, stolen, or returned, whether or not timely or properly returned, or if we receive notice that such an item or transaction has not or will not be paid, or should we not receive final settlement. We are not responsible for transactions by mail or outside depository until we actually record them. We may treat and record all transactions received after our "daily cutoff time" on a business day we are open, or received on a day we are not open for business, as if initiated on the next following business day that we are open. At our option, we may take an item for collection rather than for deposit. If we accept a third-party check for deposit, we may require any third-party endorsers to verify or guarantee their endorsements, or endorse in our presence.

Deposits of foreign items drawn or payable at or through foreign bank offices in foreign countries remain provisional and subject to reversal. Actual credit for deposits of, or payable in, foreign currency will be at the exchange rate in effect on final collection in U.S. dollars. Banks located outside the United States generally are not subject to the check clearing laws and regulations in effect in the United States which require domestic banks either to make final payment or promptly return domestic items in an expeditious manner. All deposits of foreign items are subject to Bank's customary fees and charges as described elsewhere in addition to fees and charges imposed on Bank by any foreign clearing or drawee bank with respect to the foreign items you deposit with us. You agree to assume the risk of delays and that credit given for a foreign item may be reversed, or reimbursement demanded, perhaps at a different exchange rate from that on the date deposited, long after the deposit was made and agree to hold Bank harmless from losses and expenses incurred by you arising out of or in connection with the foreign item.

We are under no obligation to accept any item, wire, electronic funds transfer, or other transaction for deposit to your account or for collection, and we may refuse to cash or give value for any such item. We may restrict access to any deposit credited to your account that violates any laws of the United States including those giving rise to OFAC sanctions. Unless we specifically permit you to do so, you may not deposit any substitute check that has not been previously handled by a bank in the collection process. This means you cannot deposit a substitute check you create, or one that is created by another person, unless we enter into an agreement to do so. Notwithstanding, if a substitute check is received for deposit you will be responsible for any losses you or another person suffers relating to such substitute check. We will notify you in case we decide to refuse a check for deposit after you have left our premises, or which you attempted to deposit without directly giving it to one of our employees. Night depositories are only for the use of customers who have entered a night depository agreement. We will not be responsible for funds left in a night depository unless deposited in accordance with such an agreement.

**NIGHT DEPOSIT** - Businesses and consumers, if applicable, may utilize the night depositories located at First Horizon banking centers to make Night or Day Drop Deposits, which may also be delivered to a banking center associate. For business customers, you grant full authority to your employees, agents, or representatives to deliver the deposits, receive receipts, additional bags and other documents and items from the Bank and we may act upon the instructions of these individuals in relation to these services. You agree that any Authorized Signer reflected on the banking resolutions is authorized to designate, add, or delete the names of individuals who are authorized to receive or otherwise deal with the bags and their contents. We may require that such authorization be in a written form acceptable to us. In certain situations, we may also require that you sign a separate safekeeping agreement.

If you use a key to access the night depository, you agree to keep the key(s) secure and available only to authorized individuals. You are responsible for successfully placing the deposits in the depository and relocking the outer door of the depository. You agree to report any unusual conditions immediately to us at 1-800-382-5645.

Deposits of currency, instruments and/or coin, along with a properly completed deposit ticket, should be delivered in disposable, tamper-evident bags meeting our specifications. You agree to prepare currency properly, including sorting by denomination and strapping in full packs of 100 bills, whenever possible. Account name and number must be clearly indicated on the outside of the bag along with itemized deposit information. Any unsealed, damaged or improperly tagged or labeled bags will be returned to you unprocessed.

Night Deposit bags will be processed by us and same-day provisional credit will be provided to your Account on the business day of processing. If you have previously arranged for us to not process the deposit or the deposit is in a locked bag for which we do not have a key, you must retrieve the unprocessed bags during the hours the banking center is open for business. If there are any discrepancies between the amount we determine to be the actual deposit, we will notify you of the discrepancy. You will be entitled to credit only for the actual deposit as determined by us, regardless of what is stated on the itemized deposit ticket. If you request a receipt be produced for deposits, the receipt will be available for pickup at the banking center for one business day only following the date the deposit is processed. The receipt will be discarded if not picked up on that business day.

Deposits made on a weekend, holiday, or after the Bank's cutoff or established deadline, will be provisionally credited to the Account on the Bank's next business day.

**WITHDRAWALS** -

**Generally** - Unless clearly indicated otherwise on the account records, any of you, acting alone, who signs in the space designated for signatures on the signature card may withdraw or transfer all or any part of the account balance at any time. Each of you (until we receive written notice to the contrary) authorizes each other person signing the signature card to endorse any item payable to you or your order for deposit to this account or any other transaction with us. Using the word "and" to connect the names of co-owners or co-fiduciaries in the account title (or elsewhere in account records) does not in itself require more than one of you to authorize a withdrawal. Any designation of a specific number of desired signatures on a signature card, resolution or other document is solely for your convenience and internal control purposes and is not binding on us.

We may debit your account on the day a check drawn on it is presented to us, or at such earlier time on or after we receive notice by any means that the check has been deposited in another financial institution.

**Postdated checks** - A postdated check is one which bears a date later than the date on which the check is written. We may properly pay and charge your account for a postdated check even though payment was made before the date of the check.

**Checks and withdrawal rules** - If you do not purchase your check blanks from us, you must be certain that we approve the check blanks you purchase. We may refuse any withdrawal or transfer request which you attempt on forms not approved by us or by any method we do not specifically permit. You agree not to use any checks that contain a background image, or the selection of ink choices, including gel pens, that interfere with our or any other bank's ability to produce a digital image of your check. If you do, you will be responsible for any losses you or another person suffers because of the inability to produce a readable image of your check. We may refuse any withdrawal or transfer request which is greater in number than the frequency permitted, or which is for an amount greater or less than any withdrawal limitations. We will use the date the transaction is completed by us (as opposed to the date you initiate it) to apply the frequency limitations. See the funds availability policy disclosure for information about when you can withdraw funds you deposit. For those accounts to which our funds availability policy disclosure does not apply, you can ask us when you make a deposit when those funds will be available for

© 2000 Wolters Kluwer Financial Services, Inc.
All rights reserved.

withdrawal. In addition, we may place limitations on the account until your identity is verified. We may determine the amount of available funds in your account for the purpose of deciding whether to return an item for insufficient funds at any time between the time we receive the item and when we return the item or send a notice in lieu of return. We need only make one determination, but if we choose to make a subsequent determination, the account balance at the subsequent time will determine whether there are insufficient available funds.

Even if we honor a nonconforming request, we are not required to do so later. We may treat continued abuse of the stated limitations (if any) as your act of closing the account, or we may at our option reclassify your account as a transaction account. If we reclassify your account, your account will be subject to the fees and earnings rules of the new account classification. The fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later.

**Waiver of notices** - You waive any notice of non-payment, dishonor or protest regarding any items credited to or charged against your account.

**Notice of withdrawal** - We reserve the right to require not less than 7 days' notice in writing before each withdrawal from an interest-bearing account other than a time deposit, or from any other savings account as defined by Regulation D. If in our discretion we have established savings sub-accounts within checking accounts, your statements and the way you can use your account will be unaffected. (The law requires us to reserve this right, but it is not our general policy to use it.) Withdrawals from a time account prior to maturity or prior to any notice period may be restricted and may be subject to penalty, as described elsewhere.

**DORMANT ACCOUNT** - A dormant account is one with no deposits or withdrawals in one year for transaction accounts, or two years for savings accounts. Once dormant, you will no longer receive periodic statements, and will only receive an annual statement on your account. When an account becomes dormant any items such as checks or drafts or other types of electronic fund transfers will be returned without liability to the Bank even if funds are available in your account. We may terminate a dormant account with a zero or negative balance without notice.

**OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION** - These rules apply to this account depending on state law, and the form of ownership and beneficiary designation, if any, specified on the account records. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds.

**Individual (Single Party) Account** - is an account in the name of one person.

**Joint (Multiple Party) Account - With Survivorship (And Not As Tenants In Common)** - is an account in the name of two or more persons. Each of you intend that when you die the balance in the account (subject to any previous pledge to which we have agreed) will belong to the survivor(s), even if the decedent had a will directing disposition to someone else. If two or more of you survive, you will own the balance in the account as joint tenants with survivorship and not as tenants in common.

**Joint (Multiple Party) Account - No Survivorship (As Tenants In Common)** - is owned by two or more persons, but none of you intend (merely by opening this account) to create any right of survivorship in any other person. Each owner's share in the account is determined according to state law. Shares can vary depending on respective contributions and their sources. Because we will be unable to determine respective shares conclusively upon the death of an owner, you agree that we may pay out all or part of account funds on the instructions of either the decedent's personal representative or any surviving owner notwithstanding the absence of a right of survivorship. Our authority to make such payments shall not affect the respective rights of the decedent's personal representative and surviving owners to their proper shares of account proceeds, which they may seek to have determined judicially. This information will not, however, affect the number of signatures necessary for withdrawal.

**Payable-On-Death Account** - Beneficiaries cannot withdraw unless: (1) all persons creating the account die, (2) the beneficiary is then living and (3) we are not otherwise required by state law to make payment to a parent, custodian or guardian. The interest of any beneficiary is subject to any offsets or claims which we could have asserted against you or your estate. If two or more of you create this type of account, you own the account jointly with survivorship. If two or more beneficiaries are named and survive the death of all persons creating the account, beneficiaries will own this account in equal shares, without right of survivorship. The person(s) creating such an account may: (1) change beneficiaries, and (2) withdraw all or part of the account funds at any time.

**ACCOUNTS ESTABLISHED ON BEHALF OF OTHERS** - In the event an account is established by a party (i) for or on behalf of a minor (and such account is not established under the Uniform Transfer to Minors Act) or (ii) for or on behalf of another individual who is not the subject of a guardianship or conservatorship as ordered by a Court, we may in our sole discretion pay the funds on deposit in such account to the party establishing the account or, upon request, to the party for whose benefit the account was established. We will not, however, be responsible for our refusal for any reason to pay funds on deposit to a party for whom the account was established. This provision does not apply to accounts established pursuant to a written escrow agreement, accounts established by court-appointed guardians or conservators, or accounts established by a fiduciary under a written agreement.

**FIDUCIARY ACCOUNTS** - Accounts may be opened by a person acting in a fiduciary capacity. A fiduciary is someone who is appointed to act on behalf of and for the benefit of another. This account may be opened and maintained by a person or persons named as a trustee under a written trust agreement, or as executors, administrators, or conservators under court orders. You understand that by merely opening such an account, we are not acting in the capacity of a trustee in connection with the trust nor do we undertake any obligation to monitor or enforce the terms of the trust or letters. In the event that there are multiple fiduciaries (for example, co-trustees) for a single account, the funds in such an account shall be subject to withdrawal on the signature of one fiduciary, unless the contrary is noted on the signature card or other account document forming part of this agreement. Inclusion of the word "and" between the names of co-fiduciaries in the account title is not in and of itself sufficient notice of such contrary intent.

All co-fiduciaries on an account appoint each and every other fiduciary on the account as agent and attorney-in-fact for all transactions involving the account, including but not limited to, stop payment orders, deposits, withdrawing all funds or otherwise terminating the account, and overdrafts (each of you being liable for the overdrafts of the other(s)). The liability of each fiduciary on such an account shall, in addition to encumbering the account, be personal.

**STOP PAYMENTS** - Unless otherwise provided, the rules in this section cover stopping payment of items such as checks and drafts. Rules for stopping payment of other types of transfers of funds, such as consumer electronic fund transfers, may be established by law or our policy. If we have not disclosed these rules to you elsewhere, you may ask us about those rules.

We may accept a written or oral stop payment order on any item from any one of you. It is our practice to act on an oral stop payment order, or removal of a stop payment order, to the same extent if it had been in writing. In our discretion, we reserve the right to require a written stop payment order, or reversal of a stop payment order. You must make any stop-payment order in the manner required by law and we must receive it in time to give us a reasonable opportunity to act on it before our stop-payment cutoff time. A reasonable time would extend to the next business day at the same time of day on a business day we received the order. In this regard, every day is a business day except Saturdays, Sundays and federal holidays. An order received on a non-business day may reasonably be considered as having been received at 9 a.m. on the next business day. Because stop-payment orders are handled by computers, to be effective, your stop-payment order must precisely identify the number of the item, the account number, date, and amount of the item, and the payee.

You may stop payment on any item drawn on your account whether you sign the item or not. Generally, your stop-payment order is effective for six months. Your order will lapse after that time if you do not renew the order before the end of the six-month period. We are not obligated to notify you when a stop-payment order expires. We may elect to refuse the release of the stop-payment order unless requested by the person who initiated it.

If you stop payment on an item and we incur any damages or expenses because of the stop payment, you agree to indemnify us for those damages or expenses, including attorneys' fees. You assign to us all rights against the payee or any other holder of the item. You agree to cooperate with us in any legal actions that we may take against such persons. You should be aware that anyone holding the item may be entitled to enforce payment against you despite the stop-payment order.

**TELEPHONE TRANSFERS** - This section applies only to consumer (personal) accounts. You may transfer funds between accounts you have with us by contacting Customer Service or through our automated telephone transfer system using identification and your passcode or other forms of verification. We reserve the right to decline transfers between fiduciary and business accounts to personal accounts. Passcode(s) will grant access to our automated system, while other forms of verification will be used by agents. You may access the automated system by calling 1-800-382-5465 and enter, according to the system prompts, the applicable security procedure information, including the telephone transfer passcode, along with your specific funds transfer instructions. You may also make transfers of funds by contacting one of our Customer Service agents. Funds transfers may not result in immediate funds availability in the account to which the funds are to be transferred. Other account transfer restrictions may be disclosed elsewhere.

**FUTURE CHANGES** - You may close your account and terminate this agreement at any time. See provisions on TERMINATION herein. Therefore, we also may revise this agreement at any time, including but not limited to modifying or deleting existing terms or adding new terms not otherwise contemplated when you opened your account. For example, we may establish sub-accounts to your deposit accounts, modify from time to time the rates of interest we pay on deposits, and we may originate or modify fees we charge for services, providing information or notice as follows.

First, we will maintain for your inspection copies of the current agreement, rate schedules and appropriate documents at each full service Bank office. Second, we will provide current interest rate information on request. Interest on savings and checking deposits is paid at variable rates for which an advance notice of change will not be provided. Third, fees, charges, and interest amounts or interest rates, effective during a statement period, will be indicated on the checking or savings account statement for said period. You waive further notice except for notice that may be specifically required by law. Examples of instances when advance notice is not legally required include changes in charges for replacement checks, travelers' checks and money orders. Examples of when 30 days' advance notice is legally required include consumer account increases in monthly service charges and in minimum balances to earn interest or avoid service charges.

If you find any changes unacceptable, you have the option of terminating this account. If you do not do so, you will be deemed to have approved and ratified the new fees, charges or other provisions.

© 2000 Wolters Kluwer Financial Services, Inc.
All rights reserved.

**TERMINATION** - You and we each have authority to terminate the account unilaterally, without cause. Notice is necessary to effect termination, but termination may become effective at the time notice is given. Notwithstanding, we can require seven days' advance notice of withdrawal for interest bearing accounts. If we initiate termination, notice is effective when you receive it orally or in writing, or at the close of the third banking day following the date of our deposit with the U.S. Postal Service of a notification letter with first class postage affixed addressed to your account address, whether or not such notice is actually received.
If we provide notice by mail, ordinarily we will retain any checking account funds three or more banking days after such mailing in order to honor checks or drafts presented during such period. We, however, are under no obligation during or after termination to pay from uncollected funds, or from funds subject to court order or our right of setoff. We will promptly remit any paid-in, unencumbered funds remaining in the account when we close it or when we receive any uncollected items paid-in after the account is closed. Your obligation for any account deficiency is not extinguished when the account is closed, whether or not we initiate termination. We will not be liable for dishonoring any item presented for payment on or after the banking day on which the notice of termination is provided, even if unencumbered funds are present in the account. Notwithstanding, we may terminate a zero or negative balance account without notice if you have not made a deposit, payment or withdrawal from the account in 30 days.
**DUTY OF EXAMINATION, UNAUTHORIZED TRANSACTIONS** - You are in the best position to discover any forgeries, alterations and unauthorized signatures or orders affecting the account. Therefore, you agree: (1) to exercise reasonable care in examining the statement and any enclosed items we may furnish, and (2) to report promptly in writing the existence of any forgeries, material alterations or unauthorized signatures of any maker or endorser. "Unauthorized signature" includes, but is not limited to, a missing signature.
We will not be liable if items were forged or altered so that the fraud could not be detected by a reasonable person exercising ordinary care. Nor will we be liable for losses due to forgery, unauthorized signatures or alterations to the extent that your negligence substantially contributed to such losses. Examples of such negligence would include, but not be limited to, providing your account number over the telephone, failing adequately to safeguard your checkbook and, with respect to business accounts, failing adequately to investigate the background of employees with access to your bank records, failing adequately to supervise such employees, and inadequate internal financial controls or audits. Nor will we be liable for such losses on business account checks which bear the same check number as do others used with the same account.
We properly may refuse to give you credit for any forged, altered or unauthorized item drawn on your account, including the posting of a substitute check to your account, or any unauthorized withdrawal, if you do not provide a suitable affidavit supporting your claim. Further, you agree to the following limitations.
You may not assert a claim against us for the forgery, material alteration, unauthorized signature or unauthorized order of an item we paid in good faith, including a substitute check posted to your account, if you did not provide us written notice within a reasonable time, not to exceed 30 days after the earliest of the following: (1) we mailed a statement (or first made available an electronic record pursuant to an electronic banking agreement) containing sufficient identification of the item (for example, a check is sufficiently identified by check amount and serial number), and (2) you first learned of the item's forgery, material alteration, unauthorized signature or unauthorized order. Further, you may not assert a claim for a later forgery, material alteration, unauthorized signature or unauthorized order on an account if made by the same wrongdoer as an earlier forgery, material alternation, unauthorized signature or unauthorized order and if you did not provide the notice required above upon the earlier reportable instance. For business accounts, you may not assert a claim against us for the forgery, material alteration, unauthorized signature or unauthorized order regardless of how promptly you review account statements or other account information made available to you and regardless of how promptly you notify Bank of payment of unauthorized items if: (1) after experiencing a forgery, material alteration, unauthorized signature or unauthorized order on the account, Bank requests that you close your account and you refuse to do so, and closing your account could have prevented further forgeries, material alterations, unauthorized signatures, or unauthorized orders, or (2) for eligible accounts, Bank requests that you enroll in the Bank's positive pay service designed to reduce the risk of payment of unauthorized items and you refuse to do so. A claim concerning an unauthorized ACH debit transaction is precluded if not made within two business days of the transaction.
You may not assert against us other types of claims concerning transactions or charges reflected, or which you believe should have been reflected in your statement unless you provide us written notice within a reasonable time not to exceed 30 days after the earlier of our mailing the statement, providing an electronic record, or your learning of the transaction or charge, except under the following circumstances: (1) an unauthorized wire transfer claim is precluded if not made within a reasonable time, not to exceed 14 days after we mailed a transfer advice or statement reflecting the transfer, or, if earlier, the transfer became known to you, (2) a claim concerning electronic transfers for consumer accounts is precluded if not made within 60 days after we mailed the statement, or (3) a claim made as to a substitute check is precluded if not made within 40 calendar days of the date that we mailed the substitute check in question or the account statement showing that the substitute check was posted to your account, whichever is later, or (4) a shorter time is prescribed by law or by a separate agreement between you and us.
Notices required by this section of the agreement are a condition precedent to filing a lawsuit or filing a claim in arbitration in accordance with the arbitration provision beginning on page 6 of this agreement, which must in all cases be brought within one year of our mailing the statement or providing an electronic record.
Contact us if you do not receive your regular statement.
**INTEREST** - Interest will begin to accrue no later than the business day we receive credit for the deposit of non-cash items (such as checks) into the following accounts listed in the fee schedule as paying interest: (1) checking accounts, (2) consumer savings accounts, and (3) consumer time deposit accounts. With respect to other deposit accounts that pay interest, interest will begin to accrue no later than such time we consider the checks to have been collected. Accounts presumed abandoned under the law of the depository state do not pay interest. Additional terms regarding the payment of interest are further described in the Consumer Account Disclosures section of this agreement.
**ACCOUNT TRANSFER** - This account may not be transferred or assigned without our prior written consent.
**RECLAMATION** - When the U.S. Treasury seeks reclamation for items or electronic transfers previously credited to your account or paid to you, we may debit your account or otherwise collect the amount sought, and you agree to indemnify us for our resulting losses.
**SETOFF** - We may (without prior notice and when permitted by law) set off the funds in your accounts against any due and payable debt you owe us now or in the future, by any of you having the right of withdrawal, to the extent of such persons' or legal entity's right to withdraw. Your accounts include both accounts you own individually and accounts you own jointly with others. If you are a sole proprietor, we may charge any of your personal or business accounts. If, however, the debt is the result of an award in arbitration pursuant to the arbitration provision beginning on page 6 of this agreement, our right of setoff does not accrue until all applicable dates for appeals, to either state or federal courts or other forums, have expired. If the debt arises from a note, "any due and payable debt" includes the total amount of which we are entitled to demand payment under the terms of the note at the time we set off, including any balance the due date for which we properly accelerate under the note.
The funds in joint accounts, including accounts owned as tenants by the entireties, may be set off by us for any individual or joint debt of any person having withdrawal rights. To the extent that setoff of funds in an account owned by husband and wife as tenants by the entireties would ordinarily not be permitted by law for a debt of only one of the spouses, both spouses and all persons having rights of withdrawal hereby waive that right and consent to setoff for either an individual or joint debt owed by one or both of them to this bank. This waiver and consent applies to debts on which any one of you is liable, whether jointly with another, individually, or those on which you are secondarily liable.
This right of setoff does not apply to this account if: (a) it is a Health Savings Account or tax-deferred retirement account for which setoff is prohibited by law, or (b) the debt is created by a consumer credit transaction under a credit card plan (but this does not affect our rights under any consensual security interest), or (c) the debtor's right of withdrawal only arises in a representative capacity. We will not be liable for the dishonor of any check when the dishonor occurs because we set off a debt against this account. You agree to hold us harmless from any claim arising as a result of our exercise of our right of setoff.
**AUTHORIZED SIGNER** - The authorized signer (also referred to as convenience signer, agent or additional authorized signer) is authorized to operate the account and to conduct transactions on the owner's behalf. The owner does not give up any rights to act on the account, and the authorized signer may not in any manner affect the rights of the owner or beneficiaries, if any, other than by withdrawing funds from the account. The owner is responsible for any transactions of the authorized signer. We undertake no obligation to monitor transactions to determine that they are on the owner's behalf.
The owner may terminate the authorization at any time, and the authorization is automatically terminated by the death of the owner. However, we may continue to honor the transactions of the authorized signer until: (a) we have received written notice or have actual knowledge of the termination of authority, and (b) we have a reasonable opportunity to act on that notice or knowledge. We may refuse to accept an authorized signer.
**RESTRICTIVE LEGENDS** - The automated processing of the large volume of checks we receive prevents us from inspecting or looking for special instructions or "restrictive legends" on every check. Examples of restrictive legends placed on checks are "must be presented within 90 days" or "not valid for more than $1,000.00." For this reason, we are not required to honor any restrictive legend placed on checks you write. We are not responsible for any losses, claims, damages, or expenses that result from your placement of these or other special instructions on your checks.
**PAYMENT ORDER OF ITEMS** - The law permits us to pay items (such as checks or any other transactions debiting your account) drawn on your account in any order. If more than one check or order is presented for payment on the same banking day, and the aggregate amount exceeds the available balance, you agree we may pay, accept, or charge them in any order we choose. We may also debit your account on or after receiving notice of an electronic fund transfer, wire order or other transaction debiting your account. Certain types of transactions (as noted below) are processed "real-time", immediately reducing your available balance, though they may not immediately post to your account. The amounts of the overdraft and NSF fees are disclosed elsewhere. There is no overdraft fee on debit card transactions when your account has sufficient funds available at authorization, even though you no longer have funds available when the transaction posts. We encourage you to make careful records and practice good account management. This will help you to avoid writing checks or drafts without sufficient funds and incurring the resulting fees.
Except for the processing of real-time transactions, including, but not limited to, wires, ACH, debit card, ATM withdrawal, internal funds transfers, bill pay, and assuming all deposit and withdrawal transactions below are made and

© 2000 Wolters Kluwer Financial Services, Inc.
All rights reserved.

received by us within the same business day (note: it may take up to 3 days for certain debit card purchases to be presented to us from the retailer), they will post to your account in the following order:

1. Credits in descending dollar amount
2. Bank initiated debits in descending dollar amount
3. Non-returnable debits in time stamp order (e.g., wires, ACH pre-fund transactions, debit card, ATM withdrawal, internal funds transfers, bill pay)
4. Non-returnable debits not time stamped (e.g., "on us" cashed checks in check number order)
5. Returnable debits, ACH debit (non pre-fund transactions) by PAR number then checks in check number order
6. Post-system generated transactions: service charges and fees

**ACH AND WIRE TRANSFERS** - This agreement is subject to Article 4A of the Uniform Commercial Code - Fund Transfers as adopted in the state in which you have your account with us. Additional terms regarding funds transfers are described in the Funds Transfer section of this agreement. If you originate a fund transfer and you identify by name and number a beneficiary financial institution, an intermediary financial institution or a beneficiary, we and every receiving or beneficiary financial institution may rely on the identifying number to make payment. We may rely on the number even if it identifies a financial institution, person or account other than the one named. You agree to be bound by automated clearing house association rules. These rules provide, among other things, that payments made to you, or originated by you, are provisional until final settlement is made through a Federal Reserve Bank or payment is otherwise made as provided in Article 4A-403(a) of the Uniform Commercial Code. If we do not receive such payment, we are entitled to a refund from you in the amount credited to your account and the party originating such payment will not be considered to have paid the amount so credited. If we receive a credit to an account you have with us by wire or ACH, we are not required to give you any notice of the payment order or credit. We may restrict access to any funds credited to your account that violate any laws of the United States including those giving rise to OFAC sanctions.

**FACSIMILE SIGNATURES** - You authorize us, at any time, to charge you for all checks, drafts, or other orders, for the payment of money, that are drawn on us regardless of by whom or by what means the facsimile signature(s) may have been affixed so long as they resemble the facsimile signature specimen filed with us, and contain the required number of signatures for this purpose. We may refuse any check drawn upon your account if we are not satisfied your signature is genuine, or if presented in person by a holder who does not provide identification satisfactory to us, including a fingerprint image if requested.

**PLEDGES** - Unless we agree otherwise in writing, no account or deposit of any type may be pledged, transferred, or assigned to a third party.

**POWER OF ATTORNEY** - You may wish to appoint an agent to conduct transactions on your behalf. (We, however, have no duty or agreement whatsoever to monitor or insure that the acts of the agent are for your benefit.) This may be done by allowing your agent to sign in that capacity on the signature card or by separate form, such as a power of attorney. A power of attorney continues until your death or the death of the person given the power. If the power of attorney is not "durable," it is revoked when you become incompetent. A power of attorney acceptable to the Bank, which is given by any one of you, shall be effective despite the objection of any other co-owner on the same account. We may continue to honor the transactions of the agent until: (a) we have received specific account-related written notice of the termination of the authority or the death of an owner, and (b) we have had a reasonable opportunity to act on that notice. You agree not to hold us responsible for any loss or damage you may incur as a result of our following instructions given by an agent acting under a valid power of attorney.

**STALE-DATED CHECKS** - We are not obligated to, but may at our option, pay a check, other than a certified check, presented for payment more than six months after its date. If you do not want us to pay a stale-dated check, you must place a stop-payment order on the check in the manner we have described elsewhere.

**FDIC INSURANCE** - Funds in your account(s) with us are insured by the Federal Deposit Insurance Corporation (FDIC) and backed by the full faith and credit of the United States. Deposits in different branches or in branches operating under different trade names of First Horizon Bank are considered deposits at the same bank and are not separately insured. The amount of insurance coverage you have depends on the number of accounts you have with us and the ownership of those accounts. The standard deposit insurance amount is $250,000 per depositor for each account ownership category. If your account has a sweep feature that automatically transfers funds from your deposit account to an investment account, any funds transferred are not FDIC-insured. If you want additional information, you may ask us or contact the local office of the FDIC.

**ENDORSEMENTS** - We may accept for deposit any item payable to you or your order, even if they are not endorsed by you. We may give cash back to any one of you. We may supply any missing endorsement(s) for any item we accept for deposit or collection, and you warrant that all endorsements are genuine.

To ensure that your check is processed without delay, you must endorse it (sign it on the back) in a specific area. Your entire endorsement (whether a signature or a stamp) along with any other endorsement information (e.g. additional endorsements, ID information, driver's license number, etc.) must fall within 1 1/2" of the "trailing edge" of a check. Endorsements must be made in blue or black ink, so that they are readable by automated check processing equipment.

As you look at the front of a check, the "trailing edge" is the left edge. When you flip the check over, be sure to keep all endorsement information within 1 1/2" of that edge.

It is important that you confine the endorsement information to this area since the remaining blank space will be used by others in the processing of the check to place additional needed endorsements and information. You agree that you will indemnify, defend, and hold us harmless for any loss, liability, damage or expense that occurs because your endorsement, a prior endorsement or information you have printed on the back of the check obscures our endorsement.

These endorsement guidelines apply to both personal and business checks.

**DEATH OR INCOMPETENCE** - You agree to notify us promptly if any person with a right to withdraw funds from your account(s) dies or becomes legally incompetent. We may continue to honor your checks, items, and instructions until: (a) we know of your death or incompetence, and (b) we have had a reasonable opportunity to act on that knowledge. You agree that we may pay or certify checks drawn on or before the date of death or legal incompetence for up to ten (10) days after your death or legal incompetence unless ordered to stop payment by someone claiming an interest in the account.

**BACKUP WITHHOLDING/TIN CERTIFICATION** - Federal tax law requires us to report interest payments we make to you of $10 or more in a year, and to include your taxpayer identification number (TIN) on the report. Interest includes dividends, interest and bonus payments for purposes of this rule. Therefore, we require you to provide us with your TIN and to certify that it is correct. The TIN is either a social security number (SSN) or an employer identification number (EIN). For most organization or business accounts other than sole proprietorships, the appropriate TIN is the EIN of the organization or business entity. For sole proprietorships and single-member LLCs disregarded as separate entities under IRS rules, however, either the SSN or the EIN is appropriate. However, we must supply the IRS with both the individual owner's name and the business name of the sole proprietorship or such an LLC. The appropriate TINs for various other types of accounts are:

Account type - TIN
Individual - SSN of the individual.
Joint Account - SSN of the owner named first on the account.
Uniform Gift/Transfer to Minor - SSN of the minor.
Informal (Revocable) Trust - SSN of the owner.

In some circumstances, federal law requires us to withhold and pay to the IRS a percentage of the interest that is earned on funds in your accounts. This is known as backup withholding. We will not have to withhold interest payments when you open your account if you certify your TIN and certify that you are not subject to backup withholding due to underreporting of interest. We may subsequently be required to begin backup withholding if the IRS informs us that you supplied an incorrect TIN or that you underreported your interest income. If you do not have a TIN, we may defer backup withholding if you certify that you do not have a TIN but have applied for one. However, we must begin backup withholding if you do not supply us with a certified TIN within 60 days or we may change your account to another non-interest bearing account offered by us. If you do not have a TIN because you are a foreign person (either an individual who is a nonresident alien or a foreign organization) you must certify your foreign status. If you are an exempt payee (receiver of interest payments), you do not need to certify your TIN, but you will have to certify your exempt status and supply us with your TIN. The most common exempt payees are corporations, organizations exempt from tax under Section 501(a), and an individual retirement plan or a custodial account under Section 403(b)(7). If you do not supply us with the appropriate TIN, we may refuse to open your account.

**Failure to submit a correct certified TIN subjects you to an IRS penalty of $50.00. A false statement with respect to your TIN may also subject you to a $500.00 IRS penalty and federal prosecution. We may match the TIN and name you provide against IRS records before we file information tax returns.**

**LOST, DESTROYED, OR STOLEN CERTIFIED, CASHIER'S, OR TELLER'S CHECKS** - Under some circumstances you may be able to assert a claim for the amount of a lost, destroyed, or stolen certified, cashier's or teller's check. To assert the claim: (a) you must be the remitter (or drawer of a certified check) or payee of the check, (b) we must receive notice from you describing the check with reasonable certainty and asking for payment of the amount of the check, (c) we must receive the notice in time for us to have a reasonable opportunity to act on it, and (d) you must give us a declaration (in a form we require) of your loss with respect to the check. You can ask us for a declaration form. Even if all of these conditions are met, your claim may not be immediately enforceable. We may pay the check until the ninetieth day after the date of the check (or date of acceptance of a certified check). Therefore, your claim is not enforceable until the ninetieth day after the date of the check or date of acceptance, and the conditions listed above have been met. If we have not already paid the check, on the day your claim is enforceable we become obligated to pay you the amount of the check. We will pay you in cash or issue another certified check.

At our option, we may pay you the amount of the check before your claim becomes enforceable. However, we will require you to agree to indemnify us for any losses we might suffer. This means that if the check is presented after we pay your claim, and we pay the check, you are responsible to cover our losses. We may require you to provide a surety bond to assure that you can pay us if we suffer a loss.

**CHANGING ACCOUNT PRODUCTS** - We may change your account to another product offered by us at any time by giving you notice that your account will be changed to another product on a specified date. If your account is a time account, the change will not occur before the next maturity date of your account. If you do not close your account before the date specified in the notice, we may change your account to that other product on the date specified in the notice.

© 2000 Wolters Kluwer Financial Services, Inc.
All rights reserved.

**LEGAL ACTIONS AFFECTING YOUR ACCOUNT** - If we are served with a subpoena, government agency request for information, restraining order, writ of attachment or execution, levy, garnishment, search warrant, forfeiture or similar order or legal process relating to your account (termed "legal action" in this section) regardless of the jurisdiction of the issuing authority, we may rely on the representations made therein and comply with that legal action, regardless of the jurisdiction of the issuing authority or the location of the Bank at which the legal action is received. In these cases, we will not have any liability to you if there are insufficient funds to pay your items because we have withdrawn funds from your account or in any way restricted access to your funds in accordance with the legal action. If you believe your funds are exempt from legal action, or otherwise should not be subject to legal action (for example, if you own funds and the legal action applies to another joint owner, you believe the court, garnishor, or levying authority lacks jurisdiction over you or the property, or you believe the garnishment or levy names the wrong party as garnishee), you agree that it is your responsibility to raise any defense to the legal action against the party who originated the legal action or seek reimbursement from a joint owner, and you agree that we have no obligation to do so. If the legal action requests information about one or more, but not all, account owners or signers, we may release information about all co-owners or signers on the account, even though some of the other co-owners or signers are not covered by the legal action. We retain any account statements, items or checks, and other types of transaction records for five years. Any fees or expenses we incur in responding to any legal action (including, without limitation, attorneys' fees and our internal expenses) may be charged against your account. The list of fees applicable to your account(s) provided elsewhere may specify additional fees that we may charge for certain legal actions. Unless expressly prohibited by law, we will charge your account a fee for each legal action received, regardless of whether the action is subsequently revoked, vacated or released. We may follow the instructions of an executor, administrator, conservator, guardian or other personal representative purporting to represent any of you or your estate, if we are provided with apparently authentic copies of letters of appointment issued by a court without regard to jurisdiction.

**CHECK PROCESSING** - We process items mechanically by relying solely on the information encoded in magnetic ink along the bottom of the items. This means that we do not individually examine all of your items to determine if the item is properly completed, signed and endorsed or to determine if it contains any information other than what is encoded in magnetic ink. You agree that we have not failed to exercise ordinary care solely because we use our automated system to process items and do not inspect all items processed in such a manner. Using an automated process helps us keep costs down for you and all account holders.

**SECURITY** - It is your responsibility to protect the account number(s) and access device(s) (e.g., an ATM card, point-of-sale card and/or PIN) for your account(s). Do not discuss, compare, or share information about your account number(s) or access device(s) with anyone unless you are willing to give them full use of your money. Checks and electronic withdrawals are processed by automated methods, and anyone who obtains your account number or access device could use it to withdraw money from your account, with or without your permission.

You agree that if we offer you services appropriate for your account to help identify and limit fraud or other unauthorized transactions against your account, such as positive pay or commercially reasonable security procedures, and you reject those services, you will be responsible for any fraudulent or unauthorized transactions which could have been prevented by the services we offered, unless we acted in bad faith or to the extent our negligence contributed to the loss.

**Account numbers** - Thieves can encode your account number on a check which looks and functions like an authorized check and can be used to withdraw money from your account. Your account number can also be used to issue a "preauthorized draft." A preauthorized draft is a draft or check that can be used to withdraw money from your account. Unlike a typical personal check, you do not issue or sign a preauthorized draft, someone else does on your behalf. For example, if you provide your account number in response to a telephone solicitation, the telephone solicitor can use the account number to issue and sign a check to withdraw money from your account. If you have truly authorized the preauthorized draft (to purchase a service or merchandise, for example), it is properly payable. But it can be risky to authorize a preauthorized draft. A swindler could issue a preauthorized draft in an amount greater than you authorized, or issue additional preauthorized drafts that you have not authorized. We will not know if the withdrawal is unauthorized or in an amount greater than the amount you have authorized. Payment can be made from your account even though you did not contact us directly and order the payment.

**Access devices** - If you furnish your access device and grant actual authority to make transfers to someone who then exceeds that authority, you will be liable for the transfers unless we have been notified that transfers by that person are no longer authorized. Please review the additional information you have received or will receive regarding transfers by access device.

**Blank checks** - You must also take precaution in safeguarding your blank checks. Notify us at once if you think your blank checks have been lost or stolen. As between you and us, if you are negligent in safeguarding your checks, you must bear the loss entirely yourself, or share the loss with us if we failed to use ordinary care which substantially contributes to the loss.

**DEPOSIT OF PREAUTHORIZED DRAFTS** - Unless specifically permitted to do so, you may not deposit any preauthorized draft. This means you cannot deposit a preauthorized draft you create, or one that is created by another person, unless we enter into an agreement to do so. Notwithstanding, if a preauthorized draft is received for deposit, you agree to take back any preauthorized draft that is returned. We may reverse any credit made to your account for the preauthorized draft, or otherwise collect from you the amount of the preauthorized draft.

**CLAIM OF LOSS FOR DEBITED ITEMS** - If you claim a credit or refund because of a forgery, alteration, or any other unauthorized withdrawal, you agree to cooperate with us in the investigation of the loss, including giving us an affidavit containing whatever reasonable information we require concerning your account, the transaction, and the circumstances surrounding the loss. You will notify law enforcement authorities of any criminal act related to the claim of lost, missing, or stolen checks or unauthorized withdrawals. We will have a reasonable period of time to investigate the facts and circumstances surrounding any claim of loss. Unless we have acted in bad faith, we will not be liable for special or consequential damages, including loss of profits or opportunity, or for attorneys' fees incurred by you.

You agree that you will not waive any rights you have to recover your loss against anyone who is obligated to repay, insure, or otherwise reimburse you for your loss. You will pursue your rights or, at our option, assign them to us so that we may pursue them. Our liability will be reduced by the amount you recover or are entitled to recover from these other sources.

**CLAIM OF LOSS FOR DEPOSIT ITEMS - Concerning each item you deposit with us, or which we cash for you or give other consideration, you make the following warranties to us whether we are the payor bank or depository bank: all necessary signatures and endorsements have been placed on the item and are genuine, the item has not been materially altered and you have good title to it, and no defense of any party to the item is good against you. If any such warranty is breached, we may deduct the amount of the item from any of your accounts or otherwise collect from you this amount plus expenses.**

**When a claim is made against us for such an item, or when we receive notice of a potential claim, involving a breach of any such warranty, or notice that account funds from any item, wire, electronic funds transfer, or other transaction for deposit to your account are proceeds of unlawful activity, we may withhold from any of your accounts any amounts in dispute plus anticipated expenses until the matter is resolved. If you have not given us written notice contesting the claim or allegation within 10 days after we notify you, we may consider it valid. On request, you will promptly furnish an affidavit stating your factual basis for contesting the claim or allegation. You also will defend and indemnify us from all liability and losses we may incur by not honoring a claim or allegation.**

**TIME DEPOSITS** - Time deposits are available both to consumers and business customers. For convenience, we have included a description of the features of these accounts with other account descriptions under the Consumer Account Disclosures section of this booklet. These provisions apply to business and consumer time deposits alike.

**ADDRESS OR NAME CHANGES** - You are responsible for notifying us of any change in your address or your name. Unless we agree otherwise, change of address or name must be made in writing by at least one of the account holders. Informing us of your address or name change on a check reorder form is not sufficient. We will attempt to communicate with you only by use of the most recent address you have provided to us or a forwarding address for you if one is on file with the U.S. Postal Service. However, we will not mail any statements or account information to an address that the U.S. Postal Service has informed us is "undeliverable" or otherwise invalid. You agree that such statements and notices will be considered available to you on the day they are generated, even though the statement will not be mailed. All statements and other notices or communications may be delivered to you electronically if you have agreed to receive such notices and communications electronically through our online banking service. We may, but are not required to, change the address for you in our records if the U.S. Postal Service notifies us of a new address for you, and you waive any and all claims against us that arise in connection with any mail forwarded to you or sent to an address for you supplied by the U.S. Postal Service.

**ARBITRATION -**

**PLEASE READ THE FOLLOWING ARBITRATION PROVISION CAREFULLY. IT PROVIDES FOR MANDATORY ARBITRATION OF CONSUMER CLAIMS (SUBJECT TO SOME EXCEPTIONS).** An "arbitration" is a less formal alternative to a lawsuit or jury trial in court. A neutral third party, called an arbitrator, decides the dispute. The arbitrator applies the same law and can award the same individualized remedies that a court could award, but uses streamlined procedures and limits discovery to simplify the process and reduce costs. The arbitrator's decision is legally binding and is subject to very limited review by courts. Arbitration takes place on an individual basis, without class or representative proceedings or requests for relief on behalf of others.

*(1) Claims Subject to Arbitration*. Upon the election of either you or us, any Claims (as defined below), must be resolved by mandatory, binding arbitration. This Arbitration Provision is made pursuant to a transaction involving interstate commerce and shall be governed by and enforceable under the Federal Arbitration Act (the FAA).

Except as specified in subsection (2), the word "Claim" means any past, present, or future claim, controversy, or dispute of any kind arising from or relating to your account(s). The word "Claim" is intended to be broadly interpreted. It includes, but is not limited to, disputes involving:

- any advertisements, solicitations, disclosures or other communications relating to your account(s);
- the opening, administration and termination of account(s);
- any transactions involving your account(s);
- any interest, fees and other charges;
- any use or disclosure of information about you or your account(s);
- any other matters relating to your account(s) or your deposit relationship with us.

© 2000 Wolters Kluwer Financial Services, Inc.
All rights reserved.

All Claims are subject to this Arbitration Provision, regardless of whether the Claim: (i) previously existed, is now existing (whether discovered or undiscovered) or arises later; (ii) is based on a theory of contract, tort (including intentional tort), negligence, agency or other vicarious liability, fraud, statute, regulation, constitution, or any other source of law or equity; (iii) seeks monetary damages, or declaratory, injunctive relief, or other remedy or relief; (iv) is asserted as an initial claim, counterclaim, crossclaim, interpleader action, third-party claim or other action; or (v) is asserted as an individual claim or as part of a class action or other representative or collective action. (Any Claim asserted as part of a class action or other representative or collective action shall proceed in arbitration on an individual basis as set forth below.) Joint accountholders and authorized users on a single account or multiple accounts for which the same accountholders are legally responsible will be treated as one person for this purpose. All questions about whether disputes are subject to arbitration shall be resolved by interpreting this arbitration provision in the broadest way the law will allow it to be enforced.

Claims by or against related third parties also must be arbitrated if elected by any party. Accordingly, in this arbitration provision only, the words "we," "our," and "us" mean First Horizon Bank and its division VirtualBank, its parent company, its direct and indirect subsidiaries and affiliates, its predecessors successors, and assigns, as well as each of those entities' agents and employees. In addition, the words "you," "your," and "yours" mean the Consumer account owners, all authorized and unauthorized users or beneficiaries of the accounts, each of those person's assignees, heirs, trustees, agents, or other representatives.

*(2) Claims Not Subject to Arbitration*. You and we agree that the following Claims cannot be arbitrated and can only be decided by a court:

- claims arising from bodily injury or death;
- claims seeking only individualized relief asserted by you or us in small claims court, so long as the action remain in that court and is not removed or appealed to a court of general jurisdiction, in which case either party may elect arbitration; and
- disputes over the scope and enforceability of this arbitration provision, or whether a dispute claim must be brought in arbitration or whether subsections (4) (Commencing Arbitration) or (7) (Requirement of Individual Arbitration) have been violated.

*(3) Pre-Arbitration Notice of Disputes and Informal Resolution*. Before either you or we commence arbitration, the claimant must first send to the other a written Notice of Dispute ("Notice"). The Notice to us should be sent to:

First Horizon Bank
Attn: Legal Services
6522 Chapman Highway
Knoxville, TN 37920

("Notice Address"). The Notice to you will be sent to your address on file with your account. The Notice must include: (a) the claimant's name, address, and phone number; (b) the account number(s) at issue; (c) a description of the nature and basis of the claim or dispute; and (d) the specific relief sought. In addition, the Notice must be personally signed by you (if you are the claimant) or by a bank representative (if we are the claimant). Moreover, to safeguard your account, if you have retained an attorney to submit your Notice, you must also provide your signed written authorization for us to discuss your account and share your confidential account records with your attorney ("Attorney Authorization").

Whoever sends the Notice must give the other party 60 days after receipt of a fully complete Notice (including your Attorney Authorization, if required) to investigate the claim. During that period, either you or we may request an individualized discussion (by telephone or videoconference) regarding settlement ("Informal Settlement Conference"). The parties must work together in good faith to select a mutually agreeable time during business hours for the Informal Settlement Conference (which can be after the 60-day period). If we request the Informal Settlement Conference, we will suggest at least two times during the following 30 days for your consideration. You and a bank representative must personally participate in the Informal Settlement Conference, unless otherwise agreed in writing. Your and our lawyers (if any) also can participate.

Any applicable statute of limitations or contractual limitations periods will be tolled during the "Informal Resolution Period," which is the period between the date that a fully complete Notice (and Attorney Authorization, if required) is received by the other party and the later of (i) 60 days later or (ii) the date an Informal Settlement Conference is completed, if timely requested.

*(4) Commencing Arbitration*. An arbitration proceeding cannot be commenced until after the Informal Resolution Period has ended. A court will have authority to enforce this subsection, including the power to enjoin the filing or prosecution of arbitrations without first providing a fully complete Notice and participating in a timely requested Informal Settlement Conference. The court also may enjoin the assessment or collection of arbitration fees incurred as a result of such arbitrations. Further, unless prohibited by applicable law, the arbitration provider shall not accept nor administer any arbitration nor assess any fees unless the claimant has complied with the Notice of Informal Settlement Conference and the other requirements under Pre-Arbitration Notice of Disputes and Informal Resolution. Once the Pre-Arbitration Notice of Disputes and Informal Resolution requirements have been met, the party electing arbitration must use the arbitration administrator shown below and follow its rules and procedures for consumer disputes, except as otherwise stated in this Arbitration Provision. Copies of its current rules, procedures, forms, and related information, including information about how to file a Claim, may be obtained by contacting the Administrator as follows:

American Arbitration Association (AAA)
Case Filing Services
1101 Laurel Oak Road, Suite 100
Voorhees, NJ 08043
http://www.adr.org

If the AAA is unavailable or unwilling to administer arbitrations consistent with this arbitration provision, another arbitration provider shall be selected by agreement of the parties or, if there is not agreement, by the court.

Except for the small claims court exclusion set forth above, either you or we may ask an appropriate court to compel arbitration, or stay litigation pending arbitration, of any Claim, even if the Claim is part of a lawsuit in court. A party who has asserted a Claim in a lawsuit may nevertheless elect mandatory arbitration with respect to any Claims subsequently asserted in that lawsuit by any other party. Delay in exercising these rights shall not waive such rights. Failure to exercise arbitration rights with respect to a particular Claim shall not waive your right or our right to demand arbitration of any other Claim.

*(5) Arbitration Procedure*. A single arbitrator chosen by the administrator will resolve Claims pursuant to the consumer arbitration rules and procedures of the Administrator, as modified by this Arbitration Provision. As in court, you and we agree that any counsel representing someone in arbitration certifies that they will comply with the requirements of Federal Rule of Civil Procedure 11(b), including a certification that the claim or the relief sought is neither frivolous nor brought for an improper purpose. The arbitrator is authorized to impose any sanctions available under that rule, the Administrator's rules, or applicable federal or state law against all appropriate represented parties and counsel. The arbitrator may consider rulings in arbitrations involving other customers, but an arbitrator's ruling is not binding in proceedings involving other customers. Except as provided in subsection (8) below, the arbitrator shall apply the same substantive law that a court would apply and can award the same individualized remedies (including punitive and statutory damages and statutory attorney's fees and costs) that a court could award under applicable law and this Agreement. Unless you and we agree otherwise, any arbitration hearings will take place in the federal judicial district that includes your address on file with your account. The arbitrator may also conduct hearings by telephone or videoconference or on the basis of dispositive motions, as permitted by the arbitration administrator's applicable rules. Regardless of the manner in which the arbitration is conducted, the arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based. The arbitrator's decision is final and binding on the parties, except as provided by the FAA.

*(6) Minimum Recovery*. During the arbitration, the amount of any settlement offer shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you are entitled. If you are the claimant, you had complied with this subsection and subsections (3) (Pre-Arbitration Notice of Disputes and Informal Resolution) and (4) (Commencing Arbitration), and the arbitrator awards you an amount of money that exceeds the value of our last written settlement offer to you before the appointment of the arbitrator, then we will pay you $1,000 in lieu of any smaller award (the "Minimum Recovery"). In determining whether you are entitled to the Minimum Recovery, the arbitrator shall not consider amounts offered or awarded for attorneys' fees or costs. Any disputes as to recovery of the Minimum Recovery shall be resolved by the arbitrator, and must be raised within 14 days of the arbitrator's ruling on the merits.

*(7) Requirement of Individual Arbitration*. **You and we hereby knowingly and voluntarily waive the right to proceed as part of any class, representative, or private attorney general proceeding.** Any Claim shall be arbitrated on an individual basis only. The arbitrator's authority to resolve Claims is limited to Claims between you and us alone, and the arbitrator may award relief (including monetary, declaratory, or injunctive relief) only to the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. Furthermore, except in the case of co-account owners, Claims brought by you against us or by us against you may not be joined or consolidated in arbitration with Claims brought by or against someone other than you, unless otherwise agreed to in writing by all parties. If, after exhaustion of all appeals, any of these prohibitions on non-individualized relief, non-individualized proceedings, or consolidation are found to be unenforceable with respect to a particular claim or with respect to a particular request for relief (such as a request for injunctive relief), then that claim or request for relief shall be severed and decided by a court after all other claims and requests for relief are arbitrated.

*(8) Costs of Arbitration*. The arbitration administrator's rules will govern the allocation and payment of all fees of the arbitrator and any administrative fees charged by the Administrator. If you cannot afford your share of those fees and the administrator will not waive them (after submission of any required forms), we will pay your share of those fees, so long as you have fully complied with the requirements of subsections (3) and (4) and the amount of your claim is $50,000 or less. If, however, the arbitrator finds that you violated the standards set forth in the Federal Rules of Civil Procedure 11(b), then the payments of these fees will be governed by the Administrator's Rules. In such case, you agree to reimburse us for all monies previously disbursed that otherwise is your obligation to pay.

*(9) Survival and Severability of Arbitration Provision*. This arbitration provision shall survive: the termination of this Agreement, your fulfillment or default of your Obligations under this Agreement and/or your or our bankruptcy or insolvency (to the extent permitted by applicable law). In the event of any conflict or inconsistency between this arbitration provision and the Administrator's Rules or this Agreement, this arbitration provision will govern.

© 2000 Wolters Kluwer Financial Services, Inc.
All rights reserved.

Except as specified in subsection (7) (Requirement of Individual Arbitration), if any portion of this arbitration provision is deemed invalid or unenforceable, the remaining portions shall nevertheless remain in force.

**FORUM SELECTION AND JURY TRIAL WAIVER.** For any disputes (except for disputes brought in small claims court) that are not subject to arbitration or over any action involving the applicability or enforceability of the Arbitration or any of its parts, you agree that the venue for resolving the dispute shall be in a court of competent jurisdiction in the state where the branch at which you have your account is located. If you opened your account online and we have a branch in the state where you are a resident, then you agree that the venue for resolving the dispute shall be in a court of competent jurisdiction in the state in which you reside, and waive any objections as to personal jurisdiction or venue or any right to seek to transfer or change venue to another court.. If you opened your account online and we do not have a branch in the state where you are a resident, then you consent to the venue of a court of competent jurisdiction located within Tennessee, and waive any objections as to personal jurisdiction or venue or any right to seek to transfer or change venue to another court. You and we further agree that, to the greatest extent permitted by law, to waive the right to trial by jury of all claims.

**TIME TO BRING LEGAL ACTION.** Unless another time is provided in another provision of this Agreement or required by applicable law, an action or proceeding by you to enforce an obligation, duty, or right arising under this Agreement or under applicable law with respect to your account must be commenced within one year after the cause of action accrues. This limitation on time to bring an action shall survive any termination, amendment, or expiration of this Agreement or any other relationship between the parties.

**FUNDS TRANSFERS** - The terms used in this section have the meaning given to them in Article 4A of the Uniform Commercial Code - Funds Transfers (UCC 4A), and any regulations promulgated by the Office of Foreign Assets Control (OFAC) of the United States Treasury Department or other applicable laws, including but not limited to the Bank Secrecy Act. This section will generally not apply to you if you are a consumer. However, even if you are a consumer, this section will apply to that part of any funds transfer that is conducted by Fedwire. This section is subject to UCC 4A as adopted in the state in which you have your deposit with us. This agreement is also subject to all clearing house association rules, rules of the Board of Governors of the Federal Reserve System and their operating circulars. If any part of this agreement is determined to be unenforceable, the rest of the agreement remains effective. This agreement controls funds transfers unless supplemented or amended in a separate written agreement signed by us. This agreement does not apply to a funds transfer if any part of the transfer is governed by the Electronic Fund Transfer Act of 1978 (EFTA), except this agreement does apply to a funds transfer that is a remittance transfer as defined in EFTA unless the remittance transfer is an electronic fund transfer as defined in EFTA.

**Funds transfer** - A funds transfer is the transaction or series of transactions that begin with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. A funds transfer is completed by the acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's order. You may give us a payment order orally, electronically, or in writing, but your order cannot state any condition to payment to the beneficiary other than the time of payment.

**Authorized account** - An authorized account is a deposit account you have with us that you have designated as a source of payment of payment orders you issue to us. If you have not designated an authorized account, any account you have with us is an authorized account to the extent that payment of the payment order is not inconsistent with the use of the account.

**Acceptance of your payment order** - We are not obligated to accept any payment order that you give us, although we normally will accept your payment order if you have a withdrawable credit in an authorized account sufficient to cover the order. We may require you to enter into a wire transfer agreement if in any calendar year you initiate more than twelve (12) transfers by Fedwire. If we do not execute your payment order, but give you notice of our rejection of your payment order after the execution date or give you no notice, we are not liable to pay you as restitution any interest on a withdrawable credit in a non-interest-bearing account.

**Cutoff time** - If we do not receive your payment order or communication canceling or amending a payment order before our cutoff time on a funds transfer day for that type of order or communication, the order or communication may be deemed to be received at the opening of our next funds transfer business day.

**Payment of your order** - If we accept a payment order you give us, we may receive payment by automatically deducting from any authorized account the amount of the payment order plus the amount of any expenses and charges for our services in execution of your payment order. We are entitled to payment on the payment or execution date. Unless your payment order specifies otherwise, the payment or execution date is the funds transfer date we receive the payment order. The funds transfer is completed upon acceptance by the beneficiary's bank. Your obligation to pay your payment order is excused if the funds transfer is not completed, but you are still responsible to pay us any expenses and charges for our services. However, if you told us to route the funds transfer through an intermediate bank, and we are unable to obtain a refund because the intermediate bank that you designated has suspended payments, then you are still obligated to pay us for the payment order. You will not be entitled to interest on any refund you receive because the beneficiary's bank does not accept the payment order.

**Security procedure** - As described more fully in a separate writing, the authenticity of a payment order or communication canceling or amending a payment order issued in your name as sender may be verified by a security procedure. You affirm that you have no circumstances which are relevant to the determination of a commercially reasonable security procedure unless those circumstances are expressly contained in a separate writing signed by us. You may choose from one or more security procedures that we have developed, or you may develop your own security procedure if it is acceptable to us. If you refuse a commercially reasonable security procedure that we have offered you, you agree that you will be bound by any payment order issued in your name, whether or not authorized, that we accept in good faith and in compliance with the security procedure you have chosen.

**Duty to report unauthorized or erroneous payment** - You must exercise ordinary care to determine that all payment orders or amendments to payment orders that we accept that are issued in your name are authorized, enforceable, in the correct amount, to the correct beneficiary, and not otherwise erroneous. If you discover (or with reasonable care should have discovered) an unauthorized, unenforceable, or erroneously executed payment order or amendment, you must exercise ordinary care to notify us of the relevant facts. The time you have to notify us will depend on the circumstances, but that time will not in any circumstance exceed 14 days from when you are notified of our acceptance or execution of the payment order or amendment or that your account was debited with respect to the order or amendment. If you do not provide us with timely notice you will not be entitled to interest on any refundable amount. If we can prove that you failed to perform either of these duties with respect to an erroneous payment and that we incurred a loss as a result of the failure, you are liable to us for the amount of the loss not exceeding the amount of your order.

**Identifying number** - If your payment order identifies an intermediate bank, beneficiary bank, or beneficiary by name and number, we and every receiving or beneficiary bank may rely upon the identifying number rather than the name to make payment, even if the number identifies an intermediate bank or person different than the bank or beneficiary identified by name. Neither we nor any receiving or beneficiary bank have any responsibility to determine whether the name and identifying number refer to the same financial institution or person.

**Record of oral or telephone orders** - You agree that we may, if we choose, record any oral or telephone payment order or communication of amendment or cancelation.

**Notice of credit** - If we receive a payment order to credit an account you have with us, we are not required to provide you with any notice of the payment order or the credit.

**Provisional credit** - You agree to be bound by the automated clearing house association operating rules that provide that payments made to you or originated by you by funds transfer through the automated clearing house system are provisional until final settlement is made through a Federal Reserve Bank or otherwise payment is made as provided in Article 4A-403(a) of the Uniform Commercial Code.

**Refund of credit** - You agree that if we do not receive payment of an amount credited to your account, we are entitled to a refund from you in the amount credited and the party originating such payment will not be considered to have paid the amount so credited.

**Amendment of funds transfer agreement** - From time to time we may amend any term of this agreement by giving you reasonable notice in writing. We may give notice to anyone who is authorized to send payment orders to us in your name, or to anyone who is authorized to accept service.

**Cancelation or amendment of payment order** - You may cancel or amend a payment order you give us only if we receive the communication of cancelation or amendment before our cutoff time and in time to have a reasonable opportunity to act on it before we accept the payment order. The communication of cancelation or amendment must be presented in conformity with the same security procedure that has been agreed to for payment orders.

**Intermediaries** - We are not liable for the actions of any intermediary, regardless of whether or not we selected the intermediary. We are not responsible for acts of God, outside agencies, or nonsalaried agents.

**Limit on liability** - You waive any claim you may have against us for consequential or special damages, including loss of profit arising out of a payment order or funds transfer, unless this waiver is prohibited by law. We are not responsible for attorney fees you might incur due to erroneous execution of payment order.

**Erroneous execution** - If we receive an order to pay you, and we erroneously pay you more than the amount of the payment order, we are entitled to recover from you the amount in excess of the amount of the payment order, regardless of whether you may have some claim to the excess amount against the originator of the order.

**Objection to payment** - If we give you a notice that reasonably identifies a payment order issued in your name as sender that we have accepted and received payment for, you cannot claim that we are not entitled to retain the payment unless you notify us of your objection to the payment within 60 days of our notice to you.

## ELECTRONIC FUND TRANSFERS

Whether your account is a consumer, business or other type of non-consumer account, you may arrange in advance for deposits and/or withdrawals to be made to and from most types of accounts automatically by electronic means. This section of the Depositor Agreement, however, applies only to consumer accounts, except where reference is specifically made to a business account. Please read this disclosure carefully because it tells you your rights and obligations for the transactions listed. You should keep this notice for future reference.

© 2000 Wolters Kluwer Financial Services, Inc.
All rights reserved.

**Electronic Funds Transfers Initiated By Third Parties.** You may authorize a third party to initiate electronic funds transfers between your account and the third party's account. These transfers to make or receive payment may be one-time occurrences or may recur as directed by you. These transfers may use the Automated Clearing House (ACH) or other payments network. Your authorization to the third party to make these transfers can occur in a number of ways. In some cases, your authorization can occur when the merchant posts a sign informing you of their policy. In all cases, the transaction will require you to provide the third party with your account number and bank information. This information can typically be found on your check as well as on a deposit or withdrawal slip. Thus, you should only provide your bank and account information (whether over the phone, the Internet, or via some other method) to trusted third parties whom you have authorized to initiate these electronic funds transfers. Examples of these transfers include, but are not limited to:

- ◆ **Preauthorized credits.** You may make arrangements for certain direct deposits (such as payroll and social security payments) to be accepted into your checking or savings account(s).
- ◆ **Preauthorized payments.** You may make arrangements to pay certain recurring bills from your checking or savings account(s).
- ◆ **Electronic check conversion.** You may provide your check to a merchant or service provider who will scan the check for the encoded bank and account information. The merchant or service provider will then use this information to convert the transaction into an electronic funds transfer. This may occur at the point of purchase, or when you provide your check by other means such as by mail or drop box.
- ◆ **Electronic returned check charge.** Some merchants or service providers will initiate an electronic funds transfer to collect a charge in the event a check is returned for insufficient funds.

Please also see **Limitations on frequency of transfers** section regarding limitations that apply to savings accounts.

**Limitations on frequency of transfers.** In addition to those limitations on transfers elsewhere described, if any, the following limitations apply:

- ◆ Transfers from a savings account to another account or to third parties by preauthorized, automatic, or telephone transfer, or check, debit card or similar order to third parties are limited to six per month.

**Termination** -

- ◆ You may terminate the electronic fund transfer agreement by written notice to us.
- ◆ We may terminate the electronic fund transfer agreement by written notice to you.

**Minimum account balance** -

- ◆ We do not require you to maintain a minimum balance in any account as a condition of using an access device (card or code) to accomplish a transfer.

**FEES**

For consumer accounts, we do not charge for preauthorized payments from any type of account or direct deposits to such accounts. (If your account is a business account with charges determined on an analysis basis, a small per transaction charge is imposed according to our current Account Analysis Price Schedule.) Additional charges may be described in the Fee Schedule.

**PERIODIC STATEMENTS**

You will receive a monthly statement from us for each checking account. Savings statement will be received quarterly at a minimum. Other savings accounts may receive a statement monthly based upon activity and account type.

**PREAUTHORIZED PAYMENTS**

- ◆ **Right to stop payment and procedure for doing so.** If you have told us in advance to make regular payments out of your account, you can stop any of these payments. Here is how:

  Call or write the Bank office where you have your account. Our address and telephone number are in the Fee Schedule (Banking Online customers call 800-489-2111.) You must call or write us in time for us to receive your request 3 business days or more before the payment is scheduled to be made. If you call, we may also require you to put your request in writing and get it to us within 14 days after you call.

  We will charge you the fee listed in the Fee Schedule for each stop-payment order you give.
- ◆ **Notice of varying amounts.** If these regular payments may vary in amount, the person you are going to pay will tell you, 10 days before each payment, when it will be made and how much it will be. (You may choose instead to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.)
- ◆ **Liability for failure to stop payment of preauthorized transfer.** If you order us to stop one of these payments 3 business days or more before the transfer is scheduled, and we do not do so, we will be liable for your losses or damages.

**FINANCIAL INSTITUTION'S LIABILITY**

If we do not complete a transfer to or from your account on time or in the correct amount according to our agreement with you, we will be liable for your losses or damages. However, there are some exceptions. We will not be liable, for instance:

(1) If, through no fault of ours, you do not have enough money in your account to make the transfer.
(2) If you have an overdraft line and the transfer would go over the credit limit.
(3) If the automated teller machine where you are making the transfer does not have enough cash.
(4) If the terminal or system was not working properly and you knew about the breakdown when you started the transfer.
(5) If circumstances beyond our control (such as fire or flood) prevent the transfer, despite reasonable precautions that we have taken.
(6) If the funds are subject to legal process or other encumbrance restricting such transfer.
(7) If there has been incomplete or inaccurate information forwarded by the third party payor or payee.
(8) There may be other exceptions stated in our agreement with you.

**CONFIDENTIALITY**

In order that your privacy may be protected, we will not disclose any information about you or your account to any person, organization, or agency except:

(1) for certain routine disclosures necessary for the completion of a transfer; or
(2) for verification of the existence and condition of your account for a credit bureau or merchant; or
(3) to persons authorized by law in the course of their official duties; or
(4) to our employees, auditors, service providers, attorneys or collection agents in the course of their duties; or
(5) pursuant to a court order or lawful subpoena; or
(6) to a consumer reporting agency; or
(7) as explained in the Privacy Disclosure provided separately.

If an unauthorized disclosure has been made, we must inform you of the particulars of the disclosure within 3 days after we have discovered that an unauthorized disclosure has occurred.

**UNAUTHORIZED TRANSFERS**

Consumer Liability. If your statement shows transfers that you did not make, tell us at once. If you do not tell us within 60 days after the statement was mailed to you, you may not get back the money you lost if we can prove that with timely notification we could have stopped someone from taking the money. If a good reason such as an extended trip or hospital stay kept you from telling us, we will extend the time period.

If you think that someone has transferred or may transfer money from your account without your permission, call or write us at the telephone number listed in the Fee Schedule (Banking Online customers call 800-489-2111).

**ERROR RESOLUTION NOTICE**

In Case of Errors or Questions About Your Electronic Transfers, call us at the telephone number or write us at the address listed in the Fee Schedule (Banking Online customers call 800-489-2111). Call or write us as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer listed on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the problem or error appeared.

(1) Tell us your name and account number (if any).
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
(3) Tell us the dollar amount of the suspected error.

If you tell us orally, we may require that you send us your complaint or question in writing within 10 business days.

We will determine whether an error occurred within 10 business days after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will credit your account within 10 calendar days for the amount you think is in error, so that you will have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account.

For errors involving new accounts, point-of-sale, or foreign-initiated transactions, we may take up to 90 days to investigate your complaint or question. For new accounts, we may take up to 20 business days to credit your account for the amount you think is in error.

We will tell you the results within three business days after completing our investigation. If we decide that there was no error, we will send you a written explanation.

You may inspect or ask for copies of the documents that we used in our investigation. If there is no error, we may impose on you a reasonable charge for making such reproductions. Call 800-489-2111 or write to the address in the Fee Schedule. Our business days are Monday through Friday of every week except federal holidays.

## AVAILABILITY OF FUNDS POLICY

**Part I - Policy**

Our policy is to make funds from your checking account deposits available for withdrawal (except by wire transfer) on the first business day after the day we receive your deposit. Electronic direct deposits, if received on a business day, will be available for withdrawal on the day we receive the deposit.

Our policy concerning withdrawal by wire transfer is to make most check deposits available on the first business day after the day of the deposit and other check deposits available no later than the second business day after the day of deposit, according to a Schedule in effect, as published from time to time. Nevertheless, we will make the following deposits available for wire transfer on the first business day after deposit:

(1) Treasury checks, Federal Reserve Bank checks, Federal Home Loan Bank checks, and in-state checks issued by state or local governments, if payable to the depositor;
(2) U.S. Postal Money Orders payable to the depositor;
(3) Cashier's, certified and teller checks payable to the depositor;

© 2000 Wolters Kluwer Financial Services, Inc.
All rights reserved.

(4) Checks drawn on accounts at our bank; and
(5) The first $225 of all other checks deposited that day.

For the purpose of determining balances used to impose and to offset service charges on business accounts, we may use the availability periods assigned to checks by the aforementioned Schedule, which will be furnished on request. This Schedule provides availability periods of not greater than one day for local checks.

Every day is a business day, except Saturdays, Sundays and federal holidays. If you make a deposit during normal business hours on a business day that we are open, we will consider that day to be the day of your deposit. However, if you make a deposit after business hours, or on a day we are not open, we may consider that the deposit was made on the next business day we are open.

**Part II - Longer delays may apply for some checks**

Federal law does not require generally that banks give the same rapid availability that we usually give our customers under our "first business day" policy. Instead, the law permits banks to delay making funds available from deposited checks according to a schedule, with funds from some checks not having to be made available until the second business day after the day of deposit. The law also permits exceptions for specified reasons, which can result in certain checks not being made available until the seventh business day after deposit. Although availability for withdrawal on the first business day after the day of deposit remains our policy, we may choose to delay the availability of some checks to the extent permitted by law. When we do, however, we will notify you. Delays which meet federal schedule requirements are described below as "Case-by-case delays." Delays for specified reasons are described below as "Exceptions."

a. *Case-by-case delays.* In some cases, we will not make all of the funds that you deposit by check available for withdrawal to you on the first business day after the day of your deposit. Depending on the type of check that you deposit, funds may not be available for withdrawal until the second business day after the day of your deposit.

If we are going to delay availability for withdrawal, we will notify you at the time you make your deposit. We will also tell you when the funds will be available for withdrawal. If your deposit is not made directly to one of our employees, or if we decide to take this action after you have left the premises, we will mail you the notice by the first business day after the day we receive your deposit.

If you will need the funds from a deposit right away, you should ask us when the funds will be available for withdrawal.

b. *Exceptions.* In addition, funds you deposit by check may be delayed for a longer period under the following circumstances:

(1) We believe a check you deposit will not be paid;
(2) You deposit checks totaling more than $5,525 on any one day;
(3) You redeposit a check that has been returned unpaid;
(4) You have overdrawn your account repeatedly in the last six months;
(5) There is an emergency, such as failure of communications or computer equipment.

We will notify you if we delay your availability to withdraw funds for any of these reasons, and we will tell you when the funds will be available for withdrawal no later than the seventh business day after the day of your deposit.

**Part III - Special rules for new accounts**

If you are a new customer, the following special rules will apply during the first 30 days your account is open.

Funds from electronic direct deposits to your account will be available on the day we receive the deposit. Funds from deposits of cash, wire transfers, and the first $5,525 of a day's total deposits of cashier's, certified, teller's, travelers', and federal, state and local government checks will be available on the first business day after the day of your deposit if the deposit meets certain conditions. For example, the checks must be payable to you (and you may have to use a special deposit slip). The excess over $5,525 will be available on the ninth business day after the day of your deposit. If your deposit of these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,525 may not be available until the second business day after the day of your deposit. Funds from all other check deposits will be available on the ninth business day after the day of your deposit.

## SUBSTITUTE CHECKS AND YOUR RIGHTS

**What is a substitute check?**

To make check processing faster, federal law permits banks to replace original checks with "substitute checks." These checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a substitute check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a substitute check as proof of payment just like the original check.

Some or all of the checks that you receive back from us may be substitute checks. This notice describes rights you have when you receive substitute checks from us. The rights in this notice do not apply to original checks or to electronic debits to your account. However, you have rights under other law with respect to those transactions.

**What are my rights regarding substitute checks?**

In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a substitute check is posted to your account (for example, if you think that we withdrew the wrong amount from your account or that we withdrew money from your account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your account and fees that were charged as a result of the withdrawal (for example, bounced check fees).

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the substitute check, whichever is less. You also are entitled to interest on the amount of your refund if your account is an interest-bearing account. If your loss exceeds the amount of the substitute check, you may be able to recover additional amounts under other law.

If you use this procedure, you may receive up to $2,500 of your refund (plus interest if your account earns interest) within 10 business days after we received your claim and the remainder of your refund (plus interest if your account earns interest) not later than 45 calendar days after we received your claim.

We may reverse the refund (including any interest on the refund) if we later are able to demonstrate that the substitute check was correctly posted to your account.

**How do I make a claim for a refund?**

If you believe that you have suffered a loss relating to a substitute check that you received and that was posted to your account, please contact us by phone or visit your nearest branch.

You must contact us within 40 calendar days of the date that we mailed (or otherwise delivered by a means to which you agreed) the substitute check in question or the account statement showing that the substitute check was posted to your account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances.

Your claim must include —

- A description of why you have suffered a loss (for example, you think the amount withdrawn was incorrect);
- An estimate of the amount of your loss;
- An explanation of why the substitute check you received is insufficient to confirm that you suffered a loss; and
- A copy of the substitute check or the following information to help us identify the substitute check: the check number, the amount of the check, the date of the check, and the name of the person to whom you wrote the check.

## CONSUMER ACCOUNT DISCLOSURES

**Deposit Accounts in General**

The Federal Truth-in-Savings Act requires that certain information be provided (1) when a consumer opens a deposit account at a banking institution and (2) when a consumer inquires about deposit accounts. This document (with Fee Schedule and rate insert for interest-bearing accounts) contains all the required information for a person opening an account. If you are merely inquiring about accounts, this agreement also contains the required information, except for currently available rates of interest and annual percentage yields. Be sure to ask for this rate and yield information at any full service branch or call. Also ask or call if you are interested in any information about business accounts or other products and services we offer. Not all accounts in this Disclosure section are available in every region. See the Fee Schedule for accounts available to you.

Three basic types of deposit accounts are available: checking accounts, savings accounts and time deposit accounts (also known as Certificate of Deposit or CD accounts). We have a wide variety of these accounts, as well as packaged accounts combining checking and savings features. We also offer many different kinds of individual retirement accounts (IRAs). Only IRAs which employ bank deposits, however, are treated in this Depositor Agreement. These are our Fixed Rate IRAs, which use time deposits, and our Variable Rate IRAs, which use savings deposits.

**Checking and Savings Accounts**

Unless otherwise disclosed, all interest-bearing consumer checking and savings accounts pay variable interest; that is, your interest rate and annual percentage yield may change any time, at our discretion. Interest begins to accrue no later than the business day we receive credit for the deposit of non-cash items (for example, checks). All such currently offered accounts use the "daily balance" method to calculate interest. This method applies a daily periodic rate to the principal in the account each day.

Interest on a Traditional Savings account compounds daily and is credited quarterly. IRA savings interest is credited and compounded at quarterly intervals commencing 3 months after the initial savings deposit. All other consumer savings and checking account interest is credited and compounded monthly.

Crediting occurs (with the exception of IRA savings) on the last day of the statement cycle during which interest accrues. If you close a checking account before interest is credited, you will not receive the accrued interest. With a savings account, however, you will receive accrued interest. A Traditional Savings account will close if its balance falls to zero, and may be reactivated only if a minimum opening deposit is made.

If we permit you to convert your checking or savings account to another type and retain your old account number and statement cycle, rather than requiring you to close and open completely different accounts, fees during the conversion cycle will be either those for the new or the old type of account, at our discretion, and rates may be in any combination of the two.

© 2000 Wolters Kluwer Financial Services, Inc.
All rights reserved.

Consumer checking and savings accounts may not be used to operate a business, and we may convert an account used for such purpose to a business account. We may convert a savings account to a checking account if you exceed six preauthorized or automatic transactions per month. If a Student Checking account does not comply with any direct deposit or limited transaction requirement, we may change it at our discretion to a Traditional Checking account, resulting in monthly service charges.

We use three types of minimum balance requirements.

a. *To open.* See the Fee Schedule for required minimum opening balances.

b. *To earn interest.* When a minimum daily balance is required to earn interest, we pay interest on the entire balance in the account that day, not just the amount above the minimum. Similarly, when a minimum daily balance is required to earn interest at a higher interest rate in a "tiered rate" account and this balance requirement is met, for accounts including the Managed Asset Portfolio and the Asset Manager and Financial Manager packages of Relationship First Checking, we pay interest at the higher rate only on that portion of the account balance in the account that day above the balance requirement. For other account types, once a particular balance requirement is met, we pay interest at the higher rate on the entire balance in the account that day.

c. *To avoid a monthly service charge.* When a minimum balance is required to avoid a service charge, we require the minimum balance to be maintained every day of the statement period. Premier Checking accounts are exceptions (as described in the Fee Schedule). Traditional Savings is also an exception, in that a service charge is not made if the required minimum "average daily balance" is maintained. The "average daily balance" is calculated by adding the collected balance of the account for each day of the period and dividing that figure by the number of days in the period.

**Time Deposit Accounts (CDs)**

A Certificate of Deposit (CD) issued by our bank is not an instrument or an item as defined by the Uniform Commercial Code. Rather, it is a nonnegotiable, nontransferable receipt evidencing a deposit that creates a time deposit account (also known as a CD Account). A time deposit account is subject generally to the provisions of this document. Special rules relating to time deposit accounts follow:

a. *Minimum deposit.* The minimum opening deposit for a nonrenewable Jumbo CD is $100,000 and for other CDs is as shown in the Fee Schedule. Special promotional CDs may have other deposit requirements, as specified on the current rate schedule.

b. *Confirmation.* We will confirm each deposit by issuing a receipt setting forth the deposit amount, the maturity date, and the interest rate for the original term. The annual percentage yield will also be provided except for commercial Jumbo CDs. We are authorized to pay the deposit on the instructions of any Depositor without requiring presentment of the receipt. Ordinarily, periodic account statements are not provided.

c. *Maturity and automatic renewals*. Each deposit may be withdrawn on the maturity date, on any renewal maturity date, or within a seven-day grace period thereafter (the grace period is two days for CDs with a term of less than 30 days and for IRA time deposits with a term of 30 days or less). No interest will be earned during the grace period if the deposit is withdrawn during the grace period. Unless we notify you otherwise, each deposit and interest earned on the deposit which is left in the account after the grace period will be automatically renewed as of the last maturity date, for additional successive terms equal to the original term. Notwithstanding, time deposits of $100,000 or more (except for IRA time deposits) and business CDs do not renew automatically and will cease earning interest on the maturity date if not reinvested.

d*. Interest*. Each deposit earns interest at the rate shown on the deposit receipt until the original maturity date. Interest begins to accrue on the day the deposit is made, and is calculated by the "daily balance" method, which applies a daily periodic rate to the principal in the account each day. ("Principal" includes any interest credited to the account and not paid out.) Interest is credited at maturity. CDs with terms of over one year also credit interest on each anniversary date. We may change the interest rate for each renewal term to a rate established at our discretion without prior notice to you. You may find out the current rate by contacting us. Interest will remain in the account,capitalizing at maturity, unless you elect a different interest payment option. If you have elected a payment option, we may in our discretion terminate it in favor of payment at maturity. Ordinarily, such discretion will be exercised when an interest payment mailed to your account address has been returned undelivered, or when the account to which your interest payments were automatically credited has been closed. The annual percentage yield assumes that interest remains on deposit until maturity. A withdrawal of interest will reduce earnings.

e. *Early withdrawals.* Deposits may not be withdrawn prior to the original maturity date, or any renewal maturity date, except with our consent. When withdrawal of the entire account is permitted, we will pay accrued interest less any penalty. Both voluntary and involuntary withdrawals (such as for garnishments or setoff) are subject to early withdrawal penalties. Early withdrawals (except in case of death or mental incompetency) will be subject to a penalty equal to:

(1) For deposits with a term less than 1 year, all interest on the amount withdrawn as of the withdrawal date.
(2) For deposits with a term of 1 year to less than 2 years, 1% of the withdrawn amount.
(3) For deposits with a term equal to or greater than 2 years, 2% of the withdrawn amount.

Withdrawals from IRA time deposits before age 59 1/2 may subject you to premature distribution penalties under the Internal Revenue Code. In addition, if you have not reached 59 1/2, withdrawal of an IRA time deposit before maturity (except in the case of death or disability which prevents you from substantial gainful activity) may subject you to a bank penalty equal to:

(1) For deposits with a term less than 1 year, all interest on the amount withdrawn as of the withdrawal date.
(2) For deposits with a term of 1 year to less than 2 years, 1% of the withdrawn amount.
(3) For deposits with a term equal to or greater than 2 years, 2% of the withdrawn amount.

f. *Additions and renewals.* We reserve the right to refuse additional deposits to the account at any time. We also reserve the right to refuse to renew existing deposits upon maturity, to require redemption at maturity upon sending you advance written notice, and to change terms upon renewal.

© 2000 Wolters Kluwer Financial Services, Inc.
All rights reserved.