**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

K&A ROSARIO HOLDINGS, LLC and
MJR FUND I, INC.,

Plaintiffs,

v.

CASE NO.: 6:26-cv-1337-CEM-LHP

FIRST HORIZON BANK,

Defendant.

---

**AMENDED COMPLAINT**

Plaintiffs, K & A Rosario Holdings LLC and MJR Fund, Inc., by and through undersigned counsel, hereby sue Defendant, First Horizon Bank, and state as follows:

**THE PARTIES**

1. Plaintiff, K & A Rosario Holdings LLC ("K&A"), is a Florida limited liability company with its principal place of business in Orange County, Florida.

2. Plaintiff, MJR Fund, Inc. formerly known as Century Metals & Supplies, Inc. ("MJR"), is a Florida corporation with its principal place of business in Orange County, Florida.

3. Defendant, First Horizon Bank ("First Horizon"), is a Tennessee for-profit corporation authorized to conduct business in Florida with branch locations in Orange County.

## JURISDICTION AND VENUE

4. Jurisdiction is proper because this is an action seeking damages in excess of $50,000.00, exclusive of prejudgment interest, attorneys' fees, and costs.

5. Personal jurisdiction is proper because First Horizon operates its business in Orange County, Florida, because the causes of action arose in Orange County, Florida, and because under the First Horizon Terms and Conditions, "the venue for resolving the dispute [between the parties] shall be in a court of competent jurisdiction in the state where the branch at which [Plaintiffs] have [their] account is located."

6. All conditions precedent to the filing of this action have been waived or satisfied.

## BACKGROUND ALLEGATIONS

### *A. K&A's and MJR's business accounts with First Horizon*

7. At all relevant times, K&A and MJR have had business accounts with First Horizon.

8. The signatories of K&A's and MJR's business accounts were Misael Rosario (the Manager of K&A, President of MJR, and beneficial owner) and Jean Rosario (the Authorized Member of K&A and the Vice President of MJR).

9. Misael Rosario was also the signatory for First Horizon business accounts owned by two other Florida limited liability companies—i.e., Palm Lakes Investments LLC ("Palm Lakes") and CEME Holdings LLC ("CEME").

10. First Horizon assigned Marjorie Alonso (the First Horizon Client Specialist Team Lead) to K&A's and MJR's accounts.

***B. Lack of activity of K&A's and MJR's business accounts***

11. During the six-month period of September 2025 to March 2, 2026, the First Horizon business account of K&A did not reflect ***any*** withdrawals. In fact, the only activity on this account during those six months was (a) three deposits in September 2025; and (b) monthly interest.

12. The First Horizon business account of MJR reflected more activity than K&A's business account. However, most of the withdrawals in MJR's business account were between $101.00 and $5,148.00. And in the four months leading to March 2026, the largest withdrawal from MJR's business account was $44,801.36.

13. Similarly, in the six months before March 2026, the First Horizon business account of Palm Lakes did not reflect any wire transfers out to any third parties.

14. Additionally, in the five months before March 2026, the First Horizon business account of CEME reflected only one wire transfer out of the account to a third party for only $101.78.

15. In other words, all four First Horizon business accounts for which Misael Rosario was a signatory reflected close to no wire transfers out (or very little / limited wire transfers out) during the several months leading to March 2026.

***C. First Horizon's actual knowledge regarding fraudulent transfers in late 2025 and early 2026***

16. After Plaintiffs filed their Complaint against First Horizon, Plaintiffs learned that their accounts were not the first accounts at First Horizon that were the target of identical fraudulent wire transfers.

17. Upon information and belief, on or around December 2, 2025, a previously unrecognized IP address accessed the online account of a First Horizon customer—i.e., Noisch & Ganz, P.A.

18. Upon information and belief, the location of the IP addressed that accessed Noisch & Ganz, P.A.'s online First Horizon account was not associated with Noisch & Ganz, P.A.

19. Upon information and belief, First Horizon received multiple fraudulent wire transfer requests within minutes to numerous recipients unknown to the First Horizon customer Noisch & Ganz, P.A.

20. First Horizon learned about the fraudulent wire transfers in or around early January 2026.

21. Separately. upon information and belief, on or around January 28, 2026, an unknown person made suspicious phone calls to First Horizon claiming to be speaking on behalf of another First Horizon customer (i.e., Rabideau Klein, P.A.).

22. Upon information and belief, on January 28, 2026, the suspicious caller told First Horizon that he had a new iPhone and, therefore, needed First Horizon to reissue a token.

23. Upon information and belief, First Horizon did not request nonpublic information to verify the identity of the suspicious caller and allowed the suspicious caller to change the password for the account of First Horizon's customer, Rabideau Klein, P.A., on or around January 28, 2026.

24. Upon information and belief, shortly after First Horizon received the suspicious phone calls and did not properly verify the identity of the caller, the caller initiated fourteen fraudulent wire transfers—including wire transfers of millions of dollars to Shaoxing Fanshun Import and Export Co. Ltd.

25. Upon information and belief, Rabideau Klein, P.A. contacted First Horizon on January 29, 2026 to inform First Horizon that the requested wire transfers were fraudulent.

26. As of January 29, 2026, therefore, First Horizon had actual knowledge that (1) a suspicious caller had accessed a First Horizon account by claiming to have recently obtained a "new iPhone"; (2) large wire transfers to Shaoxing Fanshun Import and Export Co. Ltd. were fraudulent; and (3) First Horizon's customers were susceptible to similar attacks.

***D. Fraudulent wire transfer requests and First Horizon's complete failure to employ security procedures***

27. On March 3, 2026, an unknown and unauthorized person gained access to Plaintiffs' online First Horizon account.

28. Importantly, the unknown and unauthorized person accessed Plaintiffs' online First Horizon account using an IP address located in Buffalo, New York. The prior logins to Plaintiffs' First Horizon online account used IP addresses located only in Florida.

29. That same day (i.e., March 3, 2026) at around 12:07 p.m., the unknown and unauthorized person called First Horizon's Treasury Management Technical Support from the telephone number 213-205-0998.

30. This telephone number does not belong to Plaintiffs or any of Plaintiffs' agents. Plaintiffs also did not register, record, or associate this phone number with First Horizon.

31. Additionally, this phone number reflects an area code in California. Plaintiffs and their authorized members/officers reside in Florida and registered only Florida telephone numbers with First Horizon.

32. The unknown and unauthorized person claimed to be Misael Rosario but spoke with a pronounced accent that did not sound like Misael Rosario and pronounced (and mispronounced) the name of Misael Rosario in distinctly different ways during his brief conversation with First Horizon—i.e., in one occasion, he claimed his name was "Misahal," and in another occasion, he claimed his name was "Misael."

33. The unknown and unauthorized person also named MJR as the account he was attempting to access, but he did not identify K&A.

34. The unknown and unauthorized person claimed he needed to update his token because he "got a new iPhone 14"—i.e., the exact same excuse that First Horizon heard and accepted in connection with the fraudulent wire transfers of January 28, 2026 for another First Horizon customer.

35. As part of the "verification process," the First Horizon agents asked the unknown and unauthorized person to spell the last name of Misael Rosario, to provide an email address, and last four digits of a phone number—all of which are pieces of information that are publicly available on Florida's Secretary of State website, online business directories such as Cybo.com, and Google searches.

36. The First Horizon agent then stated that sent a one-time passcode to the phone number and asked the unknown and unauthorized person to read out the one-time passcode.

37. The unknown and unauthorized person then stated that he could not receive the one-time passcode because "It does not come in as a text. It's a land line." He asked the First Horizon agent to sent a voice call one-time passcode.

38. Within minutes after the unknown and unauthorized person ended his phone call with First Horizon, he attempted to login to Plaintiffs' online account with First Horizon.

39. At around 12:52 p.m., First Horizon's system detected three "possible" Cross-Site Request Forgery ("CSRF") attacks—all of which originated from an IP address in Buffalo, New York.

40. Over the next 30 minutes (i.e., until about 1:24 p.m. on March 3, 2026), First Horizon received six separate wire transfer requests out of the K&A business account reflecting a total of $4,850,700.00.

41. And over the following few hours, First Horizon received two additional wire transfer requests reflecting another $1,550,000.00 from the K&A business account.

42. As explained above, K&A's business account did not reflect ***any*** withdrawals during the six-month period of September 2025 to March 2, 2026,

43. First Horizon failed to exercise ordinary care after receiving the multiple back-to-back wire transfer requests.

44. First Horizon did not use commercially reasonable security procedures in connection with the fraudulent wire transfers.

45. As explained above, First Horizon did not properly verify the fraudulent wire transfer requests.

46. On March 3, 2026, First Horizon accepted and completed three of the fraudulently requested wire transfers out from K&A business account—i.e., one for $1,000,000.00, another for $950,000.00, and another for $750,000.00.

47. On March 4, 2026, First Horizon accepted and completed another four wire transfers out from K&A business account—i.e., $950.000.00; $850,000.00; $700,000.00; and $200,000.00.

48. Finally, on March 5, 2026, First Horizon accepted and completed another two wire transfers, one out of K&A's business account and the other from MJR's business account.

49. Below is a summary of the wire transfers that First Horizon accepted and completed on March 3, 4, and 5, 2026 (collectively, the "Fraudulent Transfers"):

| Date | Account Holder | Amount | Beneficiary |
|---|---|---|---|
| March 3, 2026 | K&A | $(1,000,000.00) | Stone Creek Vineyards Inc. |
| March 3, 2026 | K&A | $ (950,000.00) | Steelcrest LLC |
| March 3, 2026 | K&A | $ (750,000.00) | Eloisa Consulting LLC |
| March 3, 2026 | K&A | $ (950,000.00) | Shaoxing Fanshun Import and Export |
| March 3, 2026 | K&A | $ (850,000.00) | Weifang MNMJ Trading Co Ltd. |
| March 3, 2026 | K&A | $ (700,000.00) | Shaoxing Fanshun Import and Export |
| March 3, 2026 | K&A | $ (200,000.00) | Eloisa Consulting LLC |
| March 4, 2026 | K&A | $ (200,000.00) | Eloisa Consulting LLC |
| March 5, 2026 | MJR | $ (435,000.00) | Eloisa Consulting LLC |
| March 5, 2026 | K&A | $ (400,000.00) | Shaoxing Fanshun Import and Export |
| March 5, 2026 | K&A | $ (240,000.00) | Shaoxing Fanshun Import and Export |
| March 5, 2026 | K&A | $ (42,700.00) | Jen-Miller Art Galleries |
| **Total** | | **$(6,517,700.00)** | |

50. Neither K&A nor MJR have previously sent any funds to (or conducted any business with) any of the beneficiaries to whom First Horizon wire transfers were sent.

51. Importantly, four of the fraudulent wire transfers from Plaintiff’s accounts (reflecting a total of $2,290,000.00) were to Shaoxing Fanshun Import and Export—i.e., the ***same*** recipient of millions of dollars in wire transfers in January 2026 that First Horizon had actual knowledge were fraudulent.

52. First Horizon was in the best position to prevent the significant fraud perpetrated against K&A and MJR.

53. Under its agreement with Plaintiffs (and under common law), First Horizon was required to establish certain security procedures for verification of wire transfer requests—including, but not limited to, procedures to verify that the communications and requests received by First Horizon are, in fact, those of K&A and MJR.

54. Moreover, First Horizon agreed to (and was otherwise obligated to) establish security procedures to authenticate K&A's and MJR's identity and verify the instructions provided to First Horizon.

55. First Horizon also agreed to be responsible for changing or updating the security credentials from time to time.

56. First Horizon failed to employ its own security procedures and otherwise failed to employ commercially reasonable security procedures.

***E. First Horizon's failure to timely notify Plaintiffs of the fraudulent wire transfer requests and unlawful attempts to exonerate itself***

57. Plaintiffs did not receive any notification from First Horizon about the Fraudulent Transfers until March 5, 2026 at 1:13 a.m.

58. Specifically, at 1:13 a.m. Eastern Time on March 5, 2026, First Horizon finally sent Plaintiffs an email stating "there are payments and/or transfers

awaiting approval. Please login prior to the payment and/or transfer cutoff time to approve or reject the transaction."

59. Egregiously, First Horizon wrote into the body of the email that it was sending the email on "Mar 4, 2026" (without reflecting any timestamp) where, in reality, First Horizon sent the email on March 5, 2026 at 1:13 a.m.

60. As soon as Plaintiffs noticed the email (i.e., around 7:00 a.m. on March 5, 2026), Plaintiffs contacted the Treasury Management department of First Horizon to report the unauthorized wire transfers.

61. First Horizon instructed Plaintiffs to contact their local branch and their Client Specialist Team Lead.

62. At 7:34 a.m. on March 5, 2026, Plaintiffs (through Misael Rosario) emailed Plaintiffs' First Horizon Client Specialist Team Lead, Marjorie Alonso, stating that "[t]here seems to be a problem with our account(s). We contacted Treasury and were told to contact the branch. Let me know what to do."

63. First Horizon then froze all four business accounts connected with Misael Rosario as well as the two personal accounts of Misael Rosario—i.e., the affected accounts of K&A and MJR as well as the unaffected accounts of Palm Lakes, CEME, and Misael Rosario.

64. Shortly thereafter, Plaintiffs demanded First Horizon to reimburse the Fraudulent Transfers.

65. First Horizon did not agree to reimburse the amounts Fraudulent Transfers.

66. On March 12, 2026, Plaintiffs delivered a letter to First Horizon demanding reimbursement of the Fraudulent Transfers.

67. On March 23, 2026, Plaintiffs (through undersigned counsel) also requested First Horizon to release and allow access to the unaffected accounts of Misael Rosario, CEME, and Palm Lakes.

68. In response to Plaintiffs' request to access the unaffected accounts, First Horizon improperly attempted to exonerate itself of liability.

69. Specifically, knowing full well that the undersigned law firm represented Plaintiffs and the related First Horizon account holders, First Horizon sent Misael Rosario a file titled "Digital Banking Takeover Reactivation Letter (System Compromise).docx" without copying the undersigned law firm.

70. First Horizon represented to Misael Rosario that he needed to sign the "Digital Banking Takeover Reactivation Letter" before Misael Rosario (or Plaintiffs) could access the frozen unaffected accounts with First Horizon.

71. When opened, the file titled "Digital Banking Takeover Reactivation Letter" reflected a heading of "Authorization and Release for Account Reactivation." This "Letter"—which First Horizon demanded Misael Rosario to

sign as a condition to allowing Misael Rosario and Plaintiffs to access their accounts—included the following wording:

> Client, for itself and its subsidiaries and affiliates, does hereby, release, acquit and forever discharge First Horizon from and against any and all known or unknown claims, damages, causes of action, lawsuits, obligations and/or liabilities or responsibilities of any kind arising out of or in any way related to Client's security incident [and] the suspension of Client's access to the Digital Banking Service …

72. To be clear, First Horizon held Plaintiffs' (as well as CEME's, Palm Lakes's, and Misael Rosario's) funds hostage in exchange for their agreement to "release … First Horizon from … any and all known or unknown claims"—all without copying Plaintiffs' counsel.

73. First Horizon's attempt to take advantage of Plaintiffs' and Misael Rosario's time-sensitive need to access their funds to strong-arm a "release" is highly improper, especially when First Horizon knew Plaintiffs and Misael Rosario were represented by counsel and yet failed to copy said counsel.

74. First Horizon has recalled and/or reimbursed only $1,952,442.19.

75. To date, First Horizon has refused to reimburse the remainder of the Fraudulent Transfers totaling $4,585,257.81.

**COUNT I**
**(REIMBURSEMENT PURSUANT TO FLA. STAT. § 670.202)**

76. Plaintiffs re-allege and incorporate the allegations set forth in paragraphs 1 through 75 herein as if fully set forth herein.

77. The funds transferred by virtue of the fraudulent wires are governed by Article 4A of the Uniform Commercial Code, codified at Fla. Stat. §670.101, *et. Seq.* ("Article 4A").

78. First Horizon failed to have commercially reasonable security procedures and measures in place in accordance with Section §670.202 of the Florida Statutes.

79. First Horizon's conduct, violates Article 4A as more fully set forth above.

80. By authorizing the fraudulent transfers, First Horizon facilitated and permitted funds to be transferred out of Plaintiffs' accounts, in violation of Fla. Stats. § 670.202 and § 670.204.

81. First Horizon did not have commercially reasonable security procedures in place to verify the transfers.

82. First Horizon had no basis to deem the Fraudulent Transfers to be authorized by Plaintiffs, in violation of Fla. Stat. § 670.202.

83. First Horizon failed to adequately comply with its own security measures and procedures to verify the Fraudulent Transfer.

84. Section 670.204 provides for a refund by a bank to its customer for unauthorized wire transfers.

85. First Horizon's authorization of the Fraudulent Transfers were in contravention of Florida Statute § 670.202, and Plaintiffs are entitled to a refund of all funds unlawfully wired by First Horizon.

86. Plaintiffs did not authorize the Fraudulent Transfers and do not and did not have any relationship with any of the beneficiaries.

87. Separately, First Horizon had a duty to contact Plaintiffs to determine whether the Fraudulent Transfers were in fact authorized, especially because the circumstances were such that a reasonable and prudent bank and its officers and employees would have suspected wrongdoing in this case.

88. Despite the Fraudulent Transfers being clearly suspicious and inconsistent with Plaintiffs' historical banking activity, First Horizon failed to safeguard the accounts.

89. As explained above, First Horizon first attempted to contact Plaintiffs to confirm the Fraudulent Transfers in the middle of the night and ***after*** First Horizon had already accepted and processed the Fraudulent Transfers.

90. First Horizon failed to exercise reasonable and ordinary care in initiating, sending and completing the transfer of funds from Plaintiffs' accounts to unauthorized recipient accounts.

91. As a result, Plaintiffs suffered and incurred damages as a direct and proximate result of the unauthorized and ineffective funds transfers.

For the reasons set forth above, Plaintiffs, K & A Rosario Holdings LLC and MJR Fund, Inc. f/k/a Century Metals & Supplies, Inc., demand entry of judgment in their favor and against Defendant, First Horizon Bank, for damages, prejudgment interest, reasonable attorneys' fees, and for such other relief as the Court deems appropriate.

**COUNT II**
**BREACH OF CONTRACT**

92. Plaintiffs re-allege and incorporate the allegations set forth in paragraphs 1 through 75 herein as if fully set forth herein.

93. At all relevant times, First Horizon and Plaintiffs were parties to binding contracts, copies of which are attached hereto as Exhibit "1."

94. The parties' agreement provides that "As described more fully in a separate writing, the authenticity of a payment order … issued in your name as sender may be verified by a security procedure." Terms and Conds. (Exhibit 1 hereto) at p. 8.

95. That "separate writing" that is incorporated by reference into the parties' agreement includes the Treasury Management Services Master Agreement ("Master Agreement") attached hereto as Exhibit "2."

96. In that "separate writing," First Horizon agreed that it "shall distribute PINs and other Security Credentials, as applicable, to the appropriate Authorized Representatives through secure email." *See* Master Agr. (Exhibit 2 hereto) at p. 52.

97. Also under the Master Agreement, security procedures "may involve a security code, password, personal identification number, user identification technology, certificate, or other means, or method of authentication, identification or verification." *See* Master Agr. (Exhibit 2 hereto) at p. 6.

98. First Horizon breached the contractual agreements by failing to adequately supervise and/or investigate the unusual and fraudulent account activity in Plaintiffs' accounts.

99. Separately, the contractual agreements state that First Horizon "normally will accept your payment order if you have a withdrawable credit in an authorized account," which is defined to mean "any account you have with [First Horizon] … to the extent that payment of the payment order is not inconsistent with the use of the account." Terms and Conds. (Exhibit 1 hereto) at p. 8.

100. The contractual definition of "authorized account" differs from the statutory definition by focusing on whether payment is "not inconsistent with the use of the account," which requires First Horizon to consider the account's use to determine whether payment orders are inconsistent with the use of the account.

101. First Horizon breached the contractual agreements by executing, authorizing, or otherwise failing to prevent the Fraudulent Transfers from Plaintiffs' accounts based upon fraudulent and clearly suspicious information as explained above.

102. The Fraudulent Transfers were unusual and inconsistent with Plaintiffs' historical banking activity and use of the accounts.

103. By executing, authorizing, and/or failing to prevent the Fraudulent Transfers, First Horizon accepted payment orders that were inconsistent with the use of Plaintiffs' accounts.

104. First Horizon breached the contractual agreements by failing to adequately investigate the unusual and fraudulent account activity before processing the transfers to determine whether the fraudulent account activity was inconsistent with the use of the account.

105. First Horizon breached the contractual agreements by accepting and acting upon instructions on Plaintiffs' accounts by a person who was not an authorized signatory of the accounts.

106. First Horizon breached the contractual agreements by allowing its employee(s) to fraudulently change the account security information on Plaintiffs' accounts and not following its own internal procedures that were intended to safeguard Plaintiffs funds.

107. First Horizon breached the contractual agreements by not following customary and reasonable banking security procedures and allowing the Fraudulent Transfers to be fraudulently transferred out of Plaintiffs' accounts.

108. First Horizon breached the contractual agreements by failing to reimburse Plaintiffs for said Fraudulent Transfers.

109. As a direct and proximate result of First Horizon's breaches of the contractual agreements, Plaintiffs have suffered damages.

110. As a result of First Horizon's breaches of the contractual agreements, First Horizon agreed that its liability for losses Plaintiffs incur in connection with their accounts include (in addition to their statutory rights) "actual damages proved that are proximately caused by our failure to exercise ordinary care."

111. First Horizon also agreed that "[d]amages for any breach of this agreement" include (in addition to Plaintiffs' statutory rights) "those [damages] which are direct and lie in contract."

For the reasons set forth above, Plaintiffs, K & A Rosario Holdings LLC and MJR Fund, Inc. f/k/a Century Metals & Supplies, Inc., demand entry of judgment in their favor and against Defendant, First Horizon Bank, for damages, prejudgment interest, reasonable attorneys' fees, and for such other relief as the Court deems appropriate.

Respectfully submitted,

/s/ Victor M. Velarde
Victor M. Velarde
Fla. Bar No. 105620
Email: vvelarde@fowler-white.com
Chloe M. Horton
Fla. Bar No. 1039500
Email: chorton@fowler-white.com

FOWLER WHITE BURNETT, P.A.
Citigroup Center
201 South Biscayne Boulevard, 20th Floor
Miami, Florida 33131
Telephone: (305) 789-9200
Facsimile: (305) 789-9201

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2026, the foregoing document was electronically filed with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/ Victor M. Velarde
Victor M. Velarde
Fla. Bar No. 105620

**<u>SERVICE LIST</u>**
**CASE NO. 6:26-cv-1337-CEM-LHP**

David B. Levin
Florida Bar No. 26394
dlevin@bakerdonelson.com
Desislava K. Docheva
Florida Bar No. 1010440
ddocheva@bakerdonelson.com
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC
200 East Broward Boulevard, Suite 2000
Fort Lauderdale, Florida 33301
Telephone: (954) 768-1600
Facsimile: (954) 333-3930
*Counsel for Defendant, First Horizon Bank*